[No. 27313. Department One. April 18, 1939.]

A. M. CASTLE & COMPANY, *Respondent*, v. PUBLIC SERVICE UNDERWRITERS, *Appellant*.[1]

[1]*Reported in 89 P. (2d) 506.*

*F. M. Reischling,* for appellant.

*Todd, Holman & Sprague (De Forest Perkins* and *Thomas Todd,* of counsel), for respondent.

STEINERT, J.—Plaintiff brought suit to recover upon a written guaranty given by defendant to secure payment of the purchase price of certain material ordered from plaintiff by a corporation not a party to this ac-

tion.  Defendant denied liability on several grounds.
Trial before the court without a jury resulted in find-
ings and conclusions upon which judgment in favor of
plaintiff was entered.  Defendant has appealed.

A proper understanding of the case requires a state-
ment of certain facts and circumstances antedating the
execution of the guaranty and explanatory of the
business relations and maneuvers of the persons, in-
dividual and corporate, involved in this controversy.

Charles H. Leber and C. A. Magnuson, two of the
principal figures in this case, became acquainted with
each other in 1931, while both were employed by an
insurance company in Seattle.  Having similar ambi-
tions along the line of insurance, they decided to en-
gage in business for themselves.

In the early part of 1932, they organized a corpora-
tion under the name of Leber & Magnuson, which, to
avoid confusion with the individuals composing it, we
shall hereinafter refer to as L. & M., Inc.  One-half of
the stock in the corporation was held by Leber, and the
other half by Magnuson and his wife.  So far as ap-
pears from the record, L. & M., Inc., was simply a hold-
ing corporation through which Leber and Magnuson
pooled their resources for the purpose of conducting
the various activities in which they subsequently en-
gaged.

In June, 1932, Leber and Magnuson organized an-
other corporation under the name of Public Service
Underwriters, appellant herein, which, for convenience,
we shall refer to as P. S. U.

It may be noted that P. S. U. was not, itself, an in-
surance company.  Its objects, as set forth in its articles
of incorporation, were to organize, own stock in, and
control various kinds of insurance companies, to bor-
row and lend money, and to subscribe for, hold, and
deal in capital stocks, bonds, mortgages, notes, and

other securities or obligations, contracts, and evidences of indebtedness of both foreign and domestic corporations.

The initial capital of P. S. U., amounting to $2,500, was advanced by L. & M., Inc. In addition to Leber and Magnuson, there were about seventy other incorporators, who invested approximately $55,000 in the stock of the company. Leber and Magnuson composed the board of trustees. Leber was elected president, and Magnuson secretary-treasurer. Under the by-laws of the corporation, the president was required to sign all notes, contracts, deeds, mortgages, and other documents of the company, and the secretary was required to sign the usual corporation memoranda and, in addition, all contracts entered into by the company.

In August, 1932, a corporation known as Public Service, Life, Health and Accident Company, which, for brevity we shall refer to as the Accident Company, was organized by Leber and Magnuson under the direction and control of P. S. U. The two individuals were likewise made president and secretary, respectively, of the Accident Company.

In order to qualify as a life insurance company under the state insurance code, it was necessary for the Accident Company to have five hundred fully paid policies, besides a certain number of applications and a required amount of cash. To meet these requirements, Magnuson proposed the issuance of a low priced policy which would prove attractive to people of moderate means. He also conceived the idea of using metal coins, instead of the conventional cards, to be carried by the policy holders for their identification in case of accident or death. Upon inquiry, he learned that such coins could be made in Seattle. In this way, Leber and Magnuson became acquainted with the local firm of Joseph Mayer Company, a corporation which manufactured

jewelry, machine dies, metal novelties, etc. In December, 1932, Joseph Mayer Company agreed to manufacture for the Accident Company two hundred such identification coins.

Following that transaction, Leber and Magnuson, particularly Magnuson, became very much impressed with the possibilities of Joseph Mayer Company as a manufacturer of commercial devices suitable for use by various Washington industries. The financial difficulties of that company, however, did not permit the expansion necessary to meet the opportunities which were thought to exist. At Mr. Mayer's repeated suggestions, Leber and Magnuson personally began lending money to Joseph Mayer Company for the purpose of enabling it to branch out in its activities. As security for these loans, Joseph Mayer Company assigned its accounts receivable to "Magnuson and Leber." This practice continued until January, 1934.

Unfortunately, the financial condition of Joseph Mayer Company grew progressively worse. In June or July of 1934, a composition with the creditors was effected, and Leber and Magnuson, personally, bought up the claims of the creditors on bases of five, ten, and fifteen cents on the dollar, according to the classification of the particular creditor. By October, 1934, Joseph Mayer Company owed Leber and Magnuson a total of $14,400.

About this time, another corporation, known as Consolidated Jewelers Manufacturing Co., which we will refer to as Consolidated, was formed to take over and operate the business of Joseph Mayer Company. Aside from three qualifying shares, all the stock of this new corporation was held by L. & M., Inc. Its directors were Leber, Magnuson, and one Thomas Briscoe, a brother-in-law of Magnuson. Upon the organization of that company, Magnuson became its president, and

Leber its secretary. For a time, Joseph Mayer was its manager, but later, in February, 1936, Briscoe succeeded him in that office.

At first, it appeared that Consolidated would be very successful in its operations, inasmuch as the former creditors of Joseph Mayer Company, with the exception of Leber and Magnuson, had been paid off and the plant was free and clear of all incumbrance, with a large inventory of equipment and material to its credit.

At this juncture, appellant, P. S. U., first became directly connected with Consolidated by purchasing from Leber and Magnuson personally, at face value, the assigned accounts held by them in the amount of $14,400. P. S. U. also advanced to Consolidated a further loan of $1,600. At about the same time, there was issued to P. S. U., without consideration, preferred stock of Consolidated of the par value of thirty-two thousand dollars. Thereafter, P. S. U. continued to lend money to Consolidated, upon its notes secured by assigned accounts, for which P. S. U. charged interest at the rate of one per cent per month on monthly balances.

Contrary to expectations, Consolidated did not prove a successful venture from a financial standpoint. It became apparent in the spring of 1936 that the company was losing about five hundred dollars a week. By March of that year, Consolidated owed P. S. U. over twenty-four thousand dollars. Thereupon, Leber and Magnuson caused Consolidated to execute a chattel mortgage to P. S. U. securing the payment of thirty thousand dollars. The mortgage covered all machinery, equipment, tools, dies, furniture, and office equipment of Consolidated. P. S. U., in turn, advanced to Consolidated the difference between the amount of the mortgage and the amount then owing by Consolidated; at the same time, P. S. U. redelivered to

Consolidated the assigned accounts which it had formerly held.

Into this web of circumstance A. M. Castle & Company, a corporation, hereinafter referred to as Castle & Co., was drawn. That company was an Illinois corporation engaged in the wholesale steel business, with an office in Seattle. It had sold steel to Joseph Mayer Company for a good many years. Although during the greater part of the time it had extended credit to the Mayer Company, towards the end it demanded payment of cash on delivery because of the jewelry company's poor financial rating. After Consolidated was organized, Castle & Co. made sales to it, allowing credit to the extent of about four hundred dollars, and usually receiving payments according to the terms given.

In the summer of 1936, Consolidated entered upon negotiations for the manufacture by it of certain metal devices known as "milk safes" for use by various dairies in the distribution of their milk. This proposed venture, however, required the expenditure of considerable money for dies and steel necessary to manufacture the appliances. The matter was discussed between Briscoe, who was the manager of Consolidated, and Leber and Magnuson, who were officers and directors of both Consolidated and P. S. U.

The narration of events thus far brings us to the point of the transaction out of which this controversy grew.

On July 22, 1936, Consolidated placed an order with a salesman of Castle & Co. for a large quantity of steel bars to be used in the manufacture of a supply of "milk safes." The sale of the steel by Castle & Co. was to be on terms of one-half of one per cent discount for payment within ten days, or net thirty days after date of invoice; delivery of the steel was to be made within ninety to one hundred twenty days. The price of the

steel was computed on the basis of its weight, but inasmuch as it could not then be determined exactly how much the complete shipment would weigh, the total cost could not be definitely ascertained, although it was estimated at about $2,200. Most of the steel had to be specially cut to suit the purpose for which it was to be used, and that part of the order was obtained by Castle & Co. from a mill in the East.

On receipt of the above order by Castle & Co., its credit manager, C. V. Staats, declined to accept it on account of the large amount involved and the credit rating of Consolidated. Mr. Staats had information concerning the connection between Consolidated and P. S. U. and knew of the thirty thousand dollar chattel mortgage held by the latter. He accordingly demanded of P. S. U. that it guarantee the account. Pursuant to his demand, Castle & Co., on August 5, 1936, received from P. S. U. the following letter:

"A. M. Castle & Company          August 4, 1936
32 W. Connecticut Street
Seattle, Washington
          ATTENTION:  C. V. STAATS
Gentlemen:
  "In regard to Consolidated Jewelers Manufacturing Company's Order No. 00913.
  "In regard to the above numbered order of the Consolidated Jewelers Manufacturing Company, we will guaranty the payment of the account in any amount up to, but in no event exceeding, Twenty-Two Hundred Dollars ($2200.00).
  "Our understanding is that this account is due and payable net sixty days after date of invoice with your prevailing discount in the event that it is paid prior to the sixty day due date.
                Very truly yours,
                PUBLIC SERVICE UNDERWRITERS
CAM: B         By C. A. Magnuson,
                      Secretary"

It will be observed that this letter was not signed by Leber, the president of P. S. U., but only by Magnuson, its secretary.

Upon receipt of the letter of guaranty, the order was consummated, and the steel was prepared according to specifications. Invoice was sent to Consolidated on October 24, 1936, showing that there was owing for the shipment $1,889.21. The invoice did not contain two items of the original order, since they called for steel used in the regular course of business and, being obtainable locally, had been delivered and paid for. According to the sales contract, payment for the steel specially cut in the East became due on November 24, 1936. Owing to a strike, however, the steel did not arrive in Seattle until February, 1937.

In the meantime, Consolidated being unable to meet its general obligations, a group of liquidating trustees was appointed by the creditors, and Kenneth M. Jackson, treasurer of Consolidated, was placed in charge of its affairs. Castle & Co. thereafter had some negotiations with Jackson relative to the disposition to be made of the steel on its arrival. On or about November 24, 1936, when payment became due, Jackson, who at that time was a trustee and also the treasurer of P. S. U., requested and was granted an extension of time to December 15th for payment of the bill. The bill was not then paid, and on December 27th Jackson repudiated all liability of P. S. U. on its guaranty.

On December 30, 1936, Consolidated was adjudicated bankrupt on its voluntary petition. Castle & Co.'s bill has never been paid, and it now holds the steel subject to payment on delivery.

Under a series of eleven assignments, appellant presents six questions for determination.

Appellant's first contention is that it could not be held liable upon the guaranty, even if it were properly

executed, because the agreement was unenforceable by reason of the doctrine of *ultra vires,* and that the court erred in holding that the corporation was estopped to assert such defense. Its contention is based upon the uniform business corporation act, Laws of 1933, chapter 185, p. 770 [Rem. Rev. Stat. (Sup.), § 3803-1 [P. C. § 4592-31] *et seq.*], and upon its articles of incorporation.

The act just referred to provides:

"A corporation which has been formed under this act, or a corporation which existed at the time this act took effect and of a class which might be formed under this act, shall have the capacity to act possessed by natural persons, but such a corporation shall have authority to perform *only such acts as are necessary or proper to accomplish its purposes* and which are not repugnant to law." (Italics ours.) Rem. Rev. Stat. (Sup.), § 3803-11 [P. C. § 4592-41], Laws of 1933, p. 778, § 11.

In connection with that section of the statute, there should also be read Rem. Rev. Stat. (Sup.), § 3803-12 [P. C. § 4592-42], which provides:

"A corporation, *to accomplish its purpose as stated in the articles of incorporation, may guarantee,* acquire, hold, mortgage, pledge or dispose of the shares, bonds, securities and *other evidences of indebtedness of any domestic or foreign corporation."* (Italics ours.) Laws of 1933, p. 779, § 12.

As indicated in the early part of this opinion, the purposes of P. S. U., according to its articles of incorporation, were not only to own stock in various kinds of insurance companies, as emphasized by appellant, but also to lend money and to deal in notes, contracts, and evidences of indebtedness of both foreign and domestic corporations.

The restrictive provision contained in Rem. Rev. Stat. (Sup.), § 3803-11, limiting the power of a corpor-

ation to the performance of such acts "as are necessary or proper to accomplish its purposes," is plainly intended to reserve to the corporation the power to do all such acts as may be found to be necessary or proper in order to enable the corporation to accomplish the purposes for which it was organized. As a specific enlargement upon that section, Rem. Rev. Stat. (Sup.), § 3803-12, provides that, to accomplish its purposes as stated in its articles of incorporation, a corporation may, among other things, guarantee evidences of indebtedness of any other corporation.

The only question, then, is whether the execution of the guaranty in this case was necessary or proper to enable appellant P. S. U. to accomplish its purposes as stated in its articles of incorporation. Upon that proposition, we entertain no doubt.

Under its power to lend money, appellant had loaned Consolidated thirty thousand dollars. Under its power to accept and deal in securities, obligations, contracts, and evidences of indebtedness of other corporations, appellant had taken a chattel mortgage on all the machinery and equipment of Consolidated. Appellant's power to invest its funds necessarily carried with it the implied power, and also the duty, to take all reasonable and proper steps to obtain repayment of such funds.

From what we have already recited, it is manifest that P. S. U.'s chances of obtaining repayment depended largely upon the successful continuance of the business in which Consolidated was engaged. Foreclosure of the mortgage would undoubtedly have resulted in a serious loss and, moreover, would have terminated a business from which P. S. U. was realizing a lucrative rate of interest on its loan. On the other hand, to keep Consolidated a going concern required material, and to obtain material required credit. Castle

& Co. stood ready to supply the necessary steel, but Consolidated had no credit commensurate with its needs. Consolidated was, therefore, put to the necessity of either obtaining a satisfactory guarantor of its account or else going into liquidation.

P. S. U., as a principal creditor of Consolidated, stood to be the heaviest gainer or loser by the result. It, therefore, had an immediate and vital interest in the transaction. Furthermore, it not only held a large block of preferred stock of Consolidated, but, through Leber and Magnuson, it dominated and controlled the affairs of that company. To say that, under such circumstances, the execution of a guaranty by P. S. U. was not a reasonably necessary or proper thing for it to do in the accomplishment of its purposes, is to say that business foresight and acumen have no place in commercial transactions. In our opinion, P. S. U. did the very thing that anyone with good judgment would have been required to do, and would have done, under similar circumstances, and we think that, in the exigencies of the situation, the power to execute the guaranty was implied as a necessary factor in the accomplishment of its purposes.

There is ample legal precedent to support our conclusion. In 6 Fletcher, Cyclopedia of Corporations (1931), 379, § 2591, the general rule is stated as follows:

"A corporation may enter into contracts of guaranty and suretyship, if reasonably necessary or proper in the conduct of its business, or to accomplish the purpose for which it was created, or where otherwise incidental to the main business for which it was created."

The case of *Mercy v. Hall & Son, Inc.*, 177 Wash. 338, 31 P. (2d) 1009, closely resembles this case in point of fact, and, although the controversy therein arose prior to the passage of the uniform business corporation act,

the court's construction of the power of a corporation to bind itself under such circumstances was the same as our present interpretation of the act. In that case, a corporation engaged in the wholesale jewelry business guaranteed the payment of rent by another corporation, which conducted a retail jewelry store, upon the agreement of the landlord of the premises to reduce the amount specified in a lease to the retail concern. The retailer was a customer of the guarantor, and owed it eight thousand dollars. In affirming a judgment of recovery upon the guaranty of the wholesale company, we said:

"The next question is whether the appellant corporation had the power or authority to become a guarantor. Even though it had no express authority conferred by its charter, it, nevertheless, had the power to enter into the contract of guaranty if such contract was reasonably necessary or usual in the conduct of its business, or was reasonably incidental thereto.

"In 6 Fletcher Cyclopedia Corporations, p. 387, it is said:

" 'A corporation may guarantee or become surety upon the obligation of another when such a transaction is necessary in order to procure the payment of a debt due to it, . . . Accordingly, a guaranty executed to protect the corporation from a probable loss of a debt due it, and to aid in its collection, is within its power.'

"The case of *Henderson Tire & Rubber Co. v. Gregory,* 16 Fed. (2d) 589, 49 A. L. R. 1503, and *Woods Lumber Co. v. Moore,* 183 Cal. 497, 191 Pac. 905, 11 A. L. R. 549, as well as others that might be assembled, are to the same effect. The case of *Spencer v. Alki Point Transportation Co.,* 53 Wash. 77, 101 Pac. 509, 132 Am. St. 1058, recognizes the rule here stated, but does not apply it, because it could not be found from the evidence in that case that the corporation had received a benefit.

"In the present case, by reason of the modification of the lease, the appellant received a greater proportion

of the debt which the Noble Jewelry Company owed it than it would otherwise have received. The guaranty was reasonably necessary and incidental to the business at hand, and the appellant, having received a benefit therefrom, cannot now dispute its liability."

See, also, *Wheeler, Osgood & Co. v. Everett Land Co.,* 14 Wash. 630, 45 Pac. 316; *Armour & Co. v. Rosenberg & Sons Co.,* 36 Cal. App. 773, 173 Pac. 404; *Hare & Chase, Inc. v. Commonwealth Discount Corp.,* 260 Mass. 134, 156 N. E. 893; *Stromberg-Carlson Tel. Mfg. Co. v. Geo. C. Beckwith Co.,* 193 Minn. 255, 258 N. W. 314; *Hess v. W. & J. Sloane,* 66 App. Div. 522, 73 N. Y. Supp. 313, affirmed, without opinion, in 173 N. Y. 616, 66 N. E. 1110.

It is clear, from the facts as we have detailed them, that appellant received a substantial, though indirect, benefit from the transaction. The contract of sale was fully executed by Castle & Co. The steel was specially cut and prepared, was shipped, and was ready for delivery upon the payment of the bill. Having received the benefit of the acts of respondent, appellant is estopped to assert the defense of *ultra vires.*

Such defense is not available to a corporation that has received, directly or indirectly, the benefits of a contract. *Millett v. Mackie Mill Co.,* 193 Wash. 477, 76 P. (2d) 311, wherein the authorities are assembled, analyzed, and compared.

The fact that the steel was not ultimately accepted and used by Consolidated does not alter the situation. The benefit of the contract, directly to Consolidated and indirectly to P. S. U., accrued upon the extension of credit and shipment of the steel, for without that prospective resource Consolidated could not have proceeded in the operation of its business by which the indebtedness to P. S. U. was made more secure.

Appellant's second contention is that Magnu-

son, as secretary, could not alone bind the corporation upon the guaranty. It is true that Leber, the president of P. S. U., did not sign the agreement, as required by the articles of incorporation. Upon this phase of the case, however, a factual issue was presented. Leber testified that he knew nothing about the guaranty until after Consolidated had gone into liquidation. Magnuson and Briscoe testified that Leber knew all about it, and in fact had directed Magnuson to prepare the letter of guaranty, sign it for the company, and send it to Castle & Co. Upon this conflict in the evidence, the court found that P. S. U. had consented to the guaranty. In such a situation, this court is bound by the finding of the trial court. *Van Slyke Warehouse Co. v. Vilter Mfg. Co.*, 158 Wash. 659, 291 Pac. 1103; *Franklin v. Gilbert Ice Cream Co.*, 191 Wash. 269, 71 P. (2d) 52; *Lamping v. Lamping*, 197 Wash. 1, 84 P. (2d) 348.

■ Appellant's third contention is that the guaranty falls within the statute of frauds, Rem. Rev. Stat., § 5825 [P. C. § 7745], which provides that certain agreements, contracts, and promises shall be void unless they are in writing and signed by the parties to be charged therewith. The guaranty was in writing and, as already found, was the obligation of P. S. U. through the active participation and consent of Leber. It is therefore unnecessary further to discuss this phase of the case. The statute does not apply.

■ Appellant's fourth contention is that the contract of guaranty failed for lack of consideration. We have already shown wherein P. S. U. received a benefit from the contract of sale between Castle & Co. and Consolidated. There was also a detriment to Castle & Co., in that it obligated itself to fill an order of special design, which obligation it performed. Either element was a sufficient consideration for the guaranty. *Tomanovich v. Casey*, 106 Wash. 642, 180 Pac. 919;

*Washington Grocery Co. v. Citizens' Bank,* 132 Wash. 244, 231 Pac. 780.

■ Appellant's fifth contention is that P. S. U. was released from liability on the guaranty because of the extension of time for payment granted by Castle & Co. to Consolidated. However, the evidence shows that there was no consideration received by Castle & Co. for the extension; the act was wholly gratuitous.

An extension of time of payment to the principal debtor will not relieve a surety when the agreement for such extension is not based upon a valuable consideration. *Gillman v. Purdy,* 167 Wash. 659, 9 P. (2d) 1092. The promise of a creditor to extend the due date of the debtor's obligation will not discharge the surety unless there is consummated an enforceable contract which will thereafter bar a proceeding by the creditor to collect a claim within the extended time. *Commercial Sav. Bank v. Dunning,* 202 Iowa 478, 210 N. W. 599, 59 A. L. R. 983; *Industrial Loan & Inv. Co. v. Miller,* 163 Miss. 288, 141 So. 587; *Hermann v. Gressel,* 148 Misc. 775, 266 N. Y. Supp. 263.

■ Appellant's sixth and final contention, if we understand it correctly, is that Castle & Co.'s demand for the guaranty agreement varied the terms of the original order placed by Consolidated and therefore constituted a counter-offer by Castle & Co. with respect to the sale of the specially cut steel; that, since the counter-offer was accepted orally by Consolidated after the delivery of the guaranty on August 4, 1936, it was a contract separate and apart from that under which the steel locally obtained was delivered on July 23, 1936. Appellant therefore argues that, there being no partial delivery of the specially cut steel nor any memorandum taking the contract of sale out of the operation of the statute of frauds, the debtor's obligation and, with it, that of the surety, are unenforceable.

Conceding, for the purpose of the argument on this phase of the case, that respondent cannot rely upon part performance, we think that appellant's contention is fully met by the application of a principle which this court has recognized and accepted. Reverting to the form of the guaranty, we note that it refers specifically to a definite order by number. That was the order upon which this action is based. P. S. U., in positive terms, guaranteed the payment of the amount of that order in the event that it did not exceed the sum of $2,200. The recovery here sought is well within that amount. Obviously, it was the intention of all parties concerned that Consolidated should pay the amount found to be due on receipt of the invoice, and, clearly, P. S. U. guaranteed that Consolidated would so pay it. Now, whether or not the sales contract between Castle & Co. and Consolidated was unenforceable by reason of its not being in writing or not having been in part performed, is immaterial, because P. S. U. guaranteed that the account should be paid in any event, regardless of whether Consolidated paid it or refused or failed to pay it.

The rule that liability of the principal debtor measures and limits the liability of the surety is subject to several important exceptions. One is that a guaranty of an existing contract may stand by itself although the obligation guaranteed is unenforceable, provided that it can fairly be said that such was the intention of the parties. *Backus v. Feeks,* 71 Wash. 508, 129 Pac. 86, Ann. Cas. 1914 C, 553; 1 Brandt, Suretyship Guaranty (3d ed.), 104, § 44. That it was the intention of the parties that P. S. U. should be liable upon its guaranty agreement, regardless of any legal defect in the sales contract, cannot be gainsaid. Certainly, the parties did not contemplate that P. S. U. could escape liability merely because a door of escape might be open to Con-

solidated. Having guaranteed performance by the principal debtor of a promise that the debtor made and for which the debtor has received consideration, and having made its intention in that respect clear and plain, the guarantor is now bound by its agreement.

The judgment is affirmed.

BLAKE, C. J., MAIN, JEFFERS, and ROBINSON, JJ., concur.

