MILLER'S SHOES AND CLOTHING AND OTHERS
v. HAWKINS FURNITURE AND APPLIANCES, INC.,
AND OTHERS.
HAWKINS ENTERPRISES, INC., AND
ANOTHER, APPELLANTS.

221 N. W. 2d 113.

August 2, 1974—No. 44377.

*David W. Thurston,* for appellants.

*Douglass, Bell, Donlin, Shultz & Petersen, Thomas J. Lyons,* and *Gerald H. Brandenhoff,* for respondents.

Heard before Sheran, C. J., and Peterson, Kelly, and Yetka, JJ., and considered and decided by the court.

PETERSON, JUSTICE.

The issues presented by this appeal arise as a result of the sale of a closely held corporation which subsequently suffered financial difficulties. Defendant Fred Hawkins sold his shares, comprising all issued stock of Hawkins Furniture and Appliances, Inc., to one Virgil W. Madson and received in return a small amount of cash, a note executed by Madson and his wife and by the corporation, and a security interest in the corporate stock and in the corporation's equipment and inventory. After Hawkins foreclosed his security interest in those assets, plaintiffs, subsequent unsecured creditors of the corporation, brought suit to recover on their promissory note, to have the transfer of corporate assets to Hawkins declared fraudulent and void as to them, and to obtain an accounting of the proceeds from the disposition of these assets by Hawkins. The district court having

found in favor of plaintiffs, defendants appeal from the order denying their alternative motion for amended findings or a new trial.

Defendant Fred Hawkins had commenced business selling furniture and appliances in 1960, first as an individual proprietorship and subsequently as a corporation, Hawkins Furniture and Appliances, Inc., of which he was sole shareholder. The business was conducted in a building constructed and owned by Hawkins and his wife. Having determined to retire, Hawkins negotiated the sale of the business to Madson on January 2, 1968. The sale instruments consisted of a written purchase agreement, promissory note, security agreement, and lease of the building. The corporation was made a party to the purchase agreement, note, and security agreement pursuant to a resolution of authorization adopted by the corporation's board of directors. The purchase agreement may be summarized as follows:

(1) That Hawkins sell to Madson all outstanding shares of stock of the corporation.

(2) That Madson pay Hawkins $85,000 for the stock: $10,000 in cash, $10,000 by guaranteeing payment of a note of the corporation to First State Bank of North St. Paul, and $65,000 pursuant to the terms of a promissory note executed by Madson, his wife, and the corporation, which was to be the joint and individual obligation of the corporation and the Madsons.

(3) That, as security for the balance of the purchase price, Hawkins be granted a lien or security interest in the shares of stock and in various corporate assets; namely, a truck, equipment, and inventory, present and after-acquired, under the terms of a security agreement signed by the corporation and the Madsons and Hawkins.

(4) That Hawkins lease to the corporation for an additional 10 years the building in which the business had been conducted and grant the corporation or Madson an option to purchase; pay an obligation of the corporation in the amount of $3,100 to the Hillcrest State Bank; indemnify Madson for any undisclosed

claims accrued prior to the date of sale; agree to remain on the board of directors until the terms of the agreement were fulfilled; and agree not to compete with the corporation within a 50-mile radius for 5 years or until the purchase price was paid.

The transaction, in short, was primarily a sale of the stock of a corporation from one individual to another. The corporation both signed the promissory note and gave a security interest in a number of its assets to secure the note.

About 6 months after Madson took over operations, the corporation began to encounter some financial difficulties, and Madson realized that the corporation had little left in the way of unencumbered assets with which to secure a loan. To enable the corporation to borrow, Hawkins agreed to subordinate his security interest to the extent of a $20,000 loan from the First State Bank of North St. Paul. In May 1970, the bank called its note due and threatened to seize the accounts receivable of the corporation. On behalf of the corporation, Madson contacted the three plaintiffs, Miller's Shoes and Clothing, Keindel's Super Market, and Edwin Kivi. Plaintiffs loaned the corporation a total of $20,000 on unsecured demand notes signed by Madson as president of the corporation; the proceeds of these notes were deposited with the bank to cover the note of $20,000.

During the summer of 1970, the corporation continued to experience serious financial distress. For example, payments due Hawkins on the note and as rent were sometimes paid with "NSF" checks, the corporation accumulated a large number of other delinquent accounts, and its inventory fell below that required by the security agreement. In the summer of 1970, as Madson admitted, the corporation was no longer able to pay its debts as they matured. This situation amounted to default under the security agreement.

In mid-November, Madson informed Hawkins that the business was "in bad straits" and that Hawkins would either have to put more money into the business or would have to take it back. On November 30, Hawkins took possession of the building

and assets and foreclosed his security interest. He thereafter organized a new corporation, defendant Hawkins Enterprises, Inc., to which he transferred the assets after foreclosure and through which he liquidated them. It was stipulated that the foreclosure was carried out in a commercially reasonable manner. Before the present action was brought, plaintiffs had thus been unable to recover on their notes.

Two issues confront us in this appeal from the trial court's holding in favor of plaintiffs. In finding the security interest held by Hawkins invalid, the trial court reasoned that Hawkins Furniture and Appliances, Inc., could not sign a note or give a security interest in its own assets to secure the debt of its purchaser-sole stockholder for the purchase price of the stock. The trial court also concluded that there was no legal consideration to the corporation to support the note and security agreement. Under all the circumstances of this case, we believe that the corporation's participation in the purchase transaction was allowable and that there was consideration to support the note and security agreement. We therefore reverse.

In considering the transaction in question, the first issue requiring analysis is the legitimacy of the corporation's undertaking to sign the note and to "pledge" its equipment and inventory. We start from the premise that a particular kind of corporation, a closely held or one-man corporation, was involved in the present case. Madson was not only the chief officer of the corporation and one of its directors but also the sole stockholder.

On the broad issue of a corporation's authority or power to obligate itself for the debts of officers or stockholders, there appear to be two groups of cases representing slightly divergent emphases. A number of our older cases, such as those on which the trial court relied, have emphasized the propositions that a corporation may not pay the personal debts of officers or directors and that the corporate property belongs to the corporation, not to the stockholders. See, e. g., First Nat. Bank v. Flour City Trunk Co. 118 Minn. 151, 136 N. W. 563 (1912); Belle City Mal-

leable Iron Co. v. Clark, 172 Minn. 508, 215 N. W. 855 (1927); Gross Iron Ore Co. v. Paulle, 143 Minn. 48, 172 N. W. 907 (1919).

Other Minnesota cases, however, have taken a somewhat broader view of corporate powers in this regard. In Lake Park Development Co. v. Paul Steenberg Const. Co. 201 Minn. 396, 276 N. W. 651 (1937), we held that corporate officers may be authorized to use corporate assets for personal ends if all stockholders consent, saying, "Stockholders of a corporation may by their unanimous consent, either by direct act or acquiescence, invest officers of the corporation with general corporate powers involving *ultra vires* acts and appropriation of corporate assets to noncorporate purposes, where, as here, rights of creditors and violations of law are not involved, so that all acts done within the scope of such powers are the acts of the corporation, binding upon it and the stockholders." 201 Minn. 401, 276 N. W. 654.

In this respect, we note that in the present case defendant was not simply an officer but also the sole stockholder and that the board as well authorized the signing of the note and security agreement on behalf of the corporation. No existing creditors at the time were apparently prejudiced by the corporation's undertakings and any future creditors had notice of the security interest through appropriately filed financing statements. Moreover, as we discuss in more detail below, the transaction involved benefits to the corporation as well and was not simply a matter of securing the personal debts of a stockholder. All these factors serve to undercut the trial court's reliance on the proposition that a corporation may never execute a note to pay the personal debts of an officer.

Although we have never before passed upon the precise issue raised by the present case, a number of opinions from other jurisdictions have considered analogous situations. Most of the earlier cases denied the validity, as against creditors, of obligations given by the corporation to secure the purchase price of stock. See, generally, Annotation, 47 A. L. R. 78. See, also,

Branch v. Steph, 389 F. 2d 233 (10 Cir. 1968). However, we find some of the later cases upholding the validity of similar transactions more analogous in their circumstances and more persuasive in their reasoning. See, e. g., Widett v. Pilgrim Trust Co. 336 Mass. 738, 148 N. E. 2d 167 (1958) ; Shayne of Miami, Inc. v. Greybow, Inc. 232 S. C. 161, 101 S. E. 2d 486 (1957). See, also, H. M. Popp Truck Line, Inc. v. First Nat. Bank, 485 P. 2d 141 (Colo. App. 1971).

In Widett v. Pilgrim Trust Co. *supra,* the trustee in bankruptcy of Tremont Lobster House, Inc., brought suit to recover payments credited on a note given by Tremont's purchasers-stockholders to the defendant bank and secured by a chattel mortgage on personal property of Tremont. The note had been given by three individuals to the former owner of Tremont as part of the purchase price of all the capital stock and had eventually been assigned to the bank. Against contentions that the mortgage was ultra vires and that payments on the note which had been made by the corporation should be recoverable from the defendant, the court held in favor of the defendant.

The purchase agreement in the Widett case provided that the seller would pay all outstanding debts of the corporation and also contained a covenant not to compete on the part of the seller. In addition, a second document gave the buyers the right to use a particular name for the business and to buy lobster at a special price from the former owner, in return for a specified percentage of gross receipts. Given all these factors, the court held that the mortgage was not ultra vires but rather was for the benefit of the corporation. Not only did the corporation have its debts paid under the agreement but it also had the benefit of the covenant not to compete as a possible consideration for the mortgage commitment. The court also noted that the benefits given in the second document were of value to the corporation rather than to the purchasers as individuals and concluded that it was "not important on the issue of the validity of the mortgage as a corporate act whether [the benefits to the corporation] were worth

more than the consideration separately expressed therefor. They also vouch that the transaction in which the giving of the mortgage was committed was substantively beneficial to Tremont and hence a mortgage for the purposes of the corporation." 336 Mass. 745, 148 N. E. 2d 171.

We find the approach adopted by the Massachusetts court equally persuasive in an analysis of the present case. As a result of the purchase agreement, Hawkins Furniture and Appliances, Inc., received, among other benefits, an option to purchase the building in which it was located, payment of at least one outstanding obligation, and the promise of its former owner to remain on the board and not to compete. We interpret these facts as showing that in signing the note and security agreement the corporation was engaged in a transaction serving corporate purposes. Moreover, we hold that some of these same factors constituted consideration for the corporation's undertakings.

The second issue posed by this case is in fact the question of consideration to the corporation. This issue is somewhat distinct from that of corporate authority. It arises when the note and security interest are examined from the point of view of compliance with the relevant portions of the Uniform Commercial Code, Minn. St. c. 336.

With respect to the note, the corporation signed as a maker together with Madson, and Hawkins was payee and holder. Despite some argument to the contrary by defendants, there was no evidence that the corporation signed as an accommodation maker. See, Minn. St. 336.3—415. Furthermore, although Hawkins as a payee may be a holder in due course, the corporation would seem to be a party to the instrument with whom Hawkins had dealt. See, Minn. St. 336.3—305(2).[1] The defense

---

[1] Minn. St. 336.3—305 provides in part: "To the extent that a holder is a holder in due course he takes the instrument free from

    (1)    all claims to it on the part of any person; and

    (2)    all defenses of any party to the instrument with whom the holder has not dealt [with certain exceptions not relevant here]."

Minn. St. 336.3—306 provides in part: "Unless he has the rights of a

of want of consideration therefore remained available. Minn. St. 336.3—305(2), 336.3—306(c), 336.3—408.

Similarly, the requirements for a valid security interest are that "there is agreement * * * that it attach and value is given and the debtor has rights in the collateral." Minn. St. 336.9—204(1). Value is in part defined as "any consideration sufficient to support a simple contract." Minn. St. 336.1—201(44). Thus, consideration under ordinary contract-law principles was a requirement for both the note and the security interest in the present case.

Although there is no dispute among the parties that Madson received consideration in the form of the shares of stock, there remains the issue of consideration to the corporation. While some courts have held to the contrary in analogous situations, see, Shayne of Miami, Inc. v. Greybow, Inc. *supra,* we may at least assume for purposes of this case that there need be separate consideration to the corporation. As explained by the Minnesota Code Comment on § 336.3—415(1), 21B M. S. A. p. 418:

"* * * Any signer may avoid liability to one who is not a holder in due course by showing that there was no consideration for his signature (§ 3-306(c)). If he did *not* sign to accommodate or become surety for another party and received no valid consideration for his signature he is not liable to a non-holder in due course even though some other signer did receive consideration. Parkin v. Sykes, 203 Minn. 249, 280 N. W. 849 (1938)."

If separate consideration to the corporation was required, the further question is whether there was such consideration. The trial court held that there was no such consideration. However, we believe that the reasoning expressed in its memorandum was at least in part erroneous.

The factors that arguably would constitute considerations to the corporation included Hawkins' agreement to lease to the cor-

holder in due course any person takes the instrument subject to
\* \* \* \* \*
(c) the defenses of want or failure of consideration * * *."

poration for an additional 10 years the building in which the business had been conducted and to grant the corporation or Madson an option to purchase; to pay an obligation of the corporation in the amount of $3,100 to the Hillcrest State Bank; to indemnify Madson for any undisclosed claims accrued prior to the date of sale; to remain on the board of directors until the terms of the agreement were fulfilled; and to refrain from competition with the corporation within a 50-mile radius for 5 years or until the purchase price was paid. The trial court determined, however, that the corporate note of $3,100 which Hawkins promised to pay was merely an offset in the purchase price of the stock, that the agreement to indemnify ran only to Madson and not to the corporation, and that the covenant not to compete was ambiguous and not enforceable. The court, moreover, reasoned that the lease constituted a separate agreement supported by its own consideration.

We hold, however, that the covenant not to compete, the option to purchase, and the promise of Hawkins to serve on the board did constitute consideration to the corporation. The option to purchase the building in which it was located, at a price to be determined by arbitration failing agreement by the parties, was clearly a benefit to the corporation and a detriment to Hawkins. The promise of Hawkins to continue as a director was likewise legal consideration to the corporation. In Star Publishing Co. v. Martin, 48 Del. 106, 95 A. 2d 835 (1953), a case also involving the sale of a closely held corporation in exchange for notes co-signed by the corporation, the promise of the former sole stockholder to serve the corporation in an advisory capacity was held to be one item of consideration. Hawkins' promise to continue on the board, giving the corporation the benefit of his expertise and experience, is of an identical character.

We do not, moreover, consider the covenant not to compete ambiguous.[2] While its enforceability is not directly in issue on

---

[2] "11. *Restrictive Covenant*. As a condition of this sale and purchase, Hawkins agrees, for a period of five (5) years from date of closing, or

this appeal, it appears reasonably limited in scope and duration. A reasonable covenant against competition by a former stockholder does constitute consideration to a corporation. Peoples Cleaning & Dyeing Co. Inc. v. Share, 168 Minn. 474, 210 N. W. 397 (1926); Star Publishing Co. v. Martin, *supra*. Although plaintiffs additionally argue that the noncompetition agreement constitutes nothing more than obedience to the fiduciary obligation of a director, this then serves to make the more significant Hawkins' agreement to serve as a director.

We conclude, then, that there was consideration to the corporation. Because there was consideration and because, under all the peculiar circumstances of this case, the transaction was not ultra vires but one serving corporate purposes, the note and security agreement were valid corporate obligations. It was not disputed that there was default and that upon default Hawkins carried out the foreclosure in a commercially reasonable manner. It may also be noted that because there were properly filed financing statements, plaintiffs could easily have informed themselves of the superior interest held by Hawkins. We therefore

---

during such time as there is any balance due on the purchase price, whichever is greater, that he will not within a fifty (50) mile radius of the center of North Saint Paul, directly or indirectly, either as an employee, agent, proprietor, partner, officer, director or stockholder, through members of his family or otherwise:

"(a)  Engage in the business of purchasing, jobbing, selling or distributing any household furniture, furnishings, goods or appliances, or in any line of business competitive with the Corporation;

"(b)  Canvass, solicit or accept (or give anyone else the right to do so) any business related to household furniture, furnishings, and appliances from any present or past customer of the Corporation;

"(c)  Request or advise any present or future customers of the Corporation, its successors or assigns, to withdraw, curtail or cancel their business with the Corporation or Madson; or

"(d)  Disclose to any person, association, firm, corporation or other entity, except Madson, his successors or assigns, the names of past or present customers, proprietary data, or other confidential information of the Corporation."

reverse the trial court's judgment declaring the transfer of corporate property to defendants contrary to law and void as to plaintiffs.

Reversed with directions to enter judgment for defendants.