[No. 61635-3.   En Banc.   April 13, 1995.]

CERTIFICATION FROM THE UNITED STATES BANKRUPTCY
COURT FOR THE EASTERN DISTRICT OF WASHINGTON

IN

*In the Matter of*
SPOKANE CONCRETE PRODUCTS, INC.

SPOKANE CONCRETE PRODUCTS, INC., *Plaintiff*, v. U.S.
BANK OF WASHINGTON, *Defendant.*

*John L. Neff*, for plaintiff.

*Witherspoon, Kelley, Davenport & Toole*, by *Duane M. Swinton*, for defendant.

Johnson, J. — We answer three questions of state law certified to us by the United States Bankruptcy Court for the Eastern District of Washington regarding the enforce-

ability of certain corporate obligations incurred in the context of a leveraged buyout:

(a) Was the note of Spokane Concrete Products, Inc., dated March 15, 1979, to Old National Bank of Washington, predecessor of U.S. Bank of Washington, N.A., enforceable according to its terms against a Trustee in Bankruptcy?

Answer: Yes.

(b) If the note of March 15, 1979, was not enforceable, did this make the note into which the note was consolidated representing loans for Spokane Concrete operations, without segregation of the liability, including the loan of March 27, 1986, to provide funds to pay the selling shareholders, also unenforceable?

Answer: Because the note of March 15, 1979, is enforceable against the trustee in bankruptcy, lack of segregation of liabilities has no bearing on the enforceability of the consolidated note. Insofar as the enforceability of the March 27, 1986, note rests on the enforceability of the March 15, 1979, note, the March 27, 1986, note is enforceable against the trustee.

(c) Was the guaranty of [June 29, 1987],[1] guaranteeing the debt of REEC, the sole shareholder of Spokane Concrete Products, Inc., and given in conjunction with a loan to pay the balance due the selling shareholders of Spokane Concrete Products, Inc., and given in conjunction with the guaranty by REEC, Empire Forest and Western Shotcrete of Spokane Concrete debt, or the subsequent modification and increase in the indebtedness of REEC, resulting from a working capital loan from the Bank to REEC and two loans from the Bank to Empire Forest Products for an operating line and to pay off an Empire Forest debt to another financial institution, enforceable against the Trustee?

Answer: The June 29, 1987, guaranty is enforceable against the trustee. The July 24, 1990, modification agreement between REEC and U.S. Bank is enforceable against the trustee according to the terms of the June 29, 1987, guaranty by Spokane Concrete.

---

[1]The Bankruptcy Court incorrectly lists the date as June 27, 1987. Certification, at 14. The correct date is June 29, 1987. Certification, at 10.

Our answers to these questions are based on the analysis set forth below. We rely on the facts provided in the certification from the Bankruptcy Court, which constitute the entire record for this matter. RCW 2.60.010(4).

F<small>ACTS</small>

Spokane Concrete Products, Inc. (Spokane Concrete) was incorporated in 1966 as a Washington corporation to manufacture concrete products used in road and building construction. In 1978, the company was sold to Real Estate Equities Corporation (REEC) and became a wholly owned subsidiary of REEC. At the conclusion of the transaction, Spokane Concrete had assets of $1,348,822 and liabilities of $2,744,935, most of which was owed to 23 shareholders of Spokane Concrete. In the agreement of sale and redemption (Agreement), dated November 29, 1978, REEC agreed to purchase the shares owned by the 23 shareholders for a total of $2,504,213, with the purchase price guaranteed by Spokane Concrete. Pursuant to the Agreement, the 23 shareholders assigned their certificates of stock and placed them in 23 separate escrows with Old National Bank of Washington, predecessor of U.S. Bank of Washington, N.A., to secure payments by REEC.

The Agreement obligated REEC to pay $500,000 to the shareholders on March 15, 1979, followed by payments of at least $200,000 annually. At the time of the Agreement, REEC was operating at a loss and intended to use future earnings from Spokane Concrete to pay the agreed purchase price. Consequently, the sale was premised on a $500,000 loan from Old National Bank to REEC. A promissory note and security documents for the loan were dated March 15, 1979, with REEC as guaranty and Spokane Concrete as the borrower. As security, REEC provided real estate mortgages on Spokane Concrete's real property and security agreements covering Spokane Concrete's fixtures, accounts, contract rights, chattel paper, documents, instruments, general intangibles, inventory, and equipment.

On May 8, 1985, the balance of this loan, $215,849, was consolidated with two loans made in 1983 or early 1984 by Old National Bank to Spokane Concrete to upgrade plant and equipment; the total consolidated credit was $733,511. On March 7, 1986, because Spokane Concrete had insufficient income to make the required annual payment to the 23 shareholders, the consolidated loan from Old National Bank was increased by $200,000 to a total of $891,820 to fund the payment. On March 27, 1986, Spokane Concrete executed a promissory note for $887,547.01, which incorporated this increase. The payment schedule for this note was modified on July 24, 1990, by a modification agreement between Spokane Concrete and U.S. Bank (Spokane Concrete's Modification Agreement);[2] on that date, the outstanding balance was $602,793.47.

During the 1980's, REEC acquired two additional subsidiaries, Western Shotcrete Products and Empire Forest Products, Inc. The boards of directors for REEC and its three subsidiaries were comprised of the same individuals, with William J. Rielly chairing all four boards and signing all documents on their behalf. In 1987, REEC and its subsidiaries entered into cross guaranties, each corporation guarantying the others' debt. Spokane Concrete's guaranty of REEC's debt was dated June 29, 1987, the same day U.S. Bank loaned $673,000 to REEC to make the final payment to Spokane Concrete's 23 shareholders.

In a modification agreement dated July 24, 1990, between REEC and U.S. Bank (REEC's Modification Agreement), REEC and U.S. Bank agreed to modify the terms of the

---

[2]Two modification agreements were executed on July 24, 1990. The enforceability of Spokane Concrete's Modification Agreement is not at issue in this certification; U.S. Bank invokes it as evidence Spokane Concrete ratified underlying promissory notes. The enforceability of the other modification agreement, between REEC and U.S. Bank (REEC's Modification Agreement) is at issue here and depends on the enforceability of Spokane Concrete's guaranty of June 29, 1987, even though Spokane Concrete was not a party to REEC's Modification Agreement.

June 29, 1987, note to add an additional $856,451.15 to REEC's obligation, establishing an outstanding balance of $1,333,154.27. The additional amount consolidated a previous loan to REEC for working capital with two loans in December 1987 to Empire Forest Products, Inc. Although Spokane Concrete was not a party to REEC's Modification Agreement and did not execute a new guaranty, each of the three loans consolidated by REEC's Modification Agreement was executed subject to Spokane Concrete's guaranty.

On December 6, 1990, Spokane Concrete filed for chapter 11 protection and reorganization under 11 U.S.C. §§ 1101 *et seq.* Instead of filing a creditor's claim as a secured creditor, U.S. Bank filed a motion to lift the automatic stay and for abandonment of property, relying on three obligations of Spokane Concrete: the November 15, 1990, promissory note payable to U.S. Bank; the March 27, 1986, promissory note payable to Old National Bank, as modified by Spokane Concrete's Modification Agreement; and the June 29, 1987, guaranty of REEC's debt, given in conjunction with REEC's June 29, 1987, promissory note to Old National Bank, as modified by REEC's Modification Agreement. Since its bankruptcy petition was filed, Spokane Concrete has paid $1,181,819.72 to U.S. Bank.

John L. Neff, appointed as special counsel for the trustee in bankruptcy, commenced an adversary proceeding against U.S. Bank to determine the amount of U.S. Bank's secured claim against Spokane Concrete on the date of bankruptcy filing, and the amounts paid to U.S. Bank from Spokane Concrete's bankrupt estate in excess of that amount. The trustee maintains U.S. Bank is entitled only to $182,902.03, the balance on the November 15, 1990, note, and that all payments beyond that amount, plus interest thereon, should be returned to the bankrupt estate. U.S. Bank contends the disputed notes and other obligations constitute valid and enforceable security interests in all liquidated assets of Spokane Concrete, entitling U.S. Bank to retain all money paid by Spokane Concrete to cover a shortfall in excess of $1 million from loans made to Spokane Concrete and REEC.

On May 26, 1992, while the adversary proceeding was pending, Spokane Concrete's chapter 11 proceeding was converted to a chapter 7 liquidation proceeding under 11 U.S.C. § 701.

## ANALYSIS

REEC's acquisition of Spokane Concrete was a classic leveraged buyout. *See* Richard M. Cieri et al., *An Introduction to Legal and Practical Considerations in the Restructuring of Troubled Leveraged Buyouts*, 45 Bus. Law. 333, 334, 337-42 (1989) (the elements of a leveraged buyout are (1) minimum new equity investment, (2) substantial new senior debt (*i.e.,* secured debt that provides a majority of the financing), and (3) the use of subordinated debt and other types of unsecured financing to make up the difference between equity and senior debt). Where, as here, a leveraged company falters, the conflicts arising between the company and its lenders stem from the company's inability to service and restructure its debt. The substantial debt load carried by a leveraged company can put pressure on the company's cash flow, requiring a reduction in operating costs or necessitating divestiture of some assets. Cieri, 45 Bus. Law. at 344, 347. Such was the case with Spokane Concrete.

The trustee argues the promissory notes and other debt instruments executed by Spokane Concrete to complete the leveraged buyout were executed in violation of article 12, section 6 of the Washington Constitution, which imposes limitations on corporations' issuance of stock, bonds, and other obligations for the payment of money:

> Corporations shall not issue stock, except to *bona fide* subscribers therefor, or their assignees; nor shall any corporation issue any bond, or other obligation, for the payment of money, except for money or property received or labor done. . . . All fictitious increase of stock or indebtedness shall be void.

Const. art. 12, § 6. The trustee contends the phrase "nor shall any corporation issue any bond, or other obligation" should be interpreted broadly to include any obligation for the payment of money, whether evidenced by note, written contract, bond, or enforceable guaranty. Relying on article

12, section 6, the trustee asserts Spokane Concrete acted ultra vires or beyond its corporate capacity in undertaking the obligations at issue here; the trustee seeks to avoid these obligations on this basis.

To support his argument, the trustee refers us to the history of Const. art. 12, § 6. The trustee describes the inclusion of this section in our state constitution as a response to the Credit Mobilier scandal of 1872-73, which involved fraudulent stock transfers associated with the construction of the Union Pacific Railroad.[3] Available summaries of the debate during the constitutional convention are consistent with the trustee's description. The debate on article 12, section 6 centered on three concerns: (1) preventing "watering" of stock, especially by railroads; (2) controlling railroads' charges for service, which were based on the amount of stock issued, fictitious as well as actual; (3) whether, by requiring full value for capital stock, this section would cripple new or struggling corporations attempting to raise capital. *See, e.g., Journal of the Washington State Constitutional Convention, 1889,* at 738-41 (Beverly P. Rosenow ed. 1962); *The Corporations Article Again Under Consideration,* Morning Oregonian, Aug. 3, 1889, at 2; *Section Twenty One. It is Under Debate in the Committee of the Whole,* Daily Ledger, Aug. 3, 1889, at 4. The delegates were concerned with fraudulent practices by railroad companies and other corporations seeking to raise large amounts of capital, not with financial transactions of the types at issue in this case. Contrary to

---

[3]During the race to build a transcontinental railroad in the 1860's, the controlling shareholders of the Union Pacific Railroad erected a separate corporation, the Credit Mobilier of America, to control the railroad's construction. The controlling shareholders then approved and paid the inflated bills for construction submitted to the railroad by the Credit Mobilier. This arrangement was a device by which the controlling shareholders obtained additional Union Pacific shares without paying fair consideration, then sold the shares at face value to the public. Several members of Congress and at least one member of President Ulysses S. Grant's administration were implicated in the scandal. *See generally* Select Comm. To Investigate the Alleged Credit Mobilier Bribery, Report, H.R. Rep. No. 77, 42d Cong., 3d Sess. (1873); Select Comm. on Credit Mobilier and the Union Pacific Railroad, Report, H.R. Rep. No. 78, 42d Cong., 3d Sess. (1873); United States Pacific Railway Comm'n, Reports and Testimony (1888).

the trustee's assertion, we find nothing in the reported debate indicating the delegates intended article 12, section 6 to apply to promissory notes and guaranties issued for legal consideration by corporations in the course of business, unless, perhaps, such obligations were fraudulent in some fashion.

We have not addressed the meaning of "other obligations" in Const. art. 12, § 6, and we need not do so in this case. Although the trustee has not demonstrated the obligations at issue here are subject to article 12, section 6, we will assume for purposes of analysis that Spokane Concrete's obligations somehow were incurred ultra vires and turn our attention to three defenses asserted by U.S. Bank against the trustee's ultra vires claims.

U.S. Bank responds the trustee is barred from raising lack of corporate capacity to avoid Spokane Concrete's obligations to U.S. Bank. The bank asserts three arguments: (1) under RCW 23B.03.040, the trustee lacks standing to assert Spokane Concrete's execution of the challenged obligations was ultra vires or beyond its corporate capacity; (2) the trustee's ultra vires claims are barred by the 6-year statute of limitations in RCW 4.16.040; and (3) the trustee's ultra vires claims are barred by the doctrines of estoppel and ratification. Because we find the trustee's ultra vires are claims barred by the doctrines of estoppel and ratification, we will assume, without deciding, that the trustee has standing and that his claims are timely raised.

U.S. Bank argues Spokane Concrete's ratification of its promissory notes and guaranty should estop the trustee from claiming Spokane Concrete acted ultra vires or beyond its corporate capacity when it incurred those obligations. We find this argument persuasive. So long as a contractual agreement is not contrary to public policy or the terms of a statute, a corporation that has received directly or indirectly the benefits of a contract, including a contract of guaranty, generally is estopped from asserting the defense of ultra vires. *Union Fruit Producers, Inc. v. Plumb*, 1 Wn.2d 278, 284, 95 P.2d 1033 (1939); *A.M. Castle & Co. v. Public Serv.*

*Underwriters*, 198 Wash. 576, 589, 89 P.2d 506 (1939); *Millett v. Mackie Mill Co.*, 193 Wash. 477, 480, 76 P.2d 311 (1938); *Pierce v. Astoria Fish Factors, Inc.*, 31 Wn. App. 214, 218-20, 640 P.2d 40, *review demied*, 97 Wn.2d 1034 (1982). By retaining and using the benefit obtained, the corporation ratifies the contract, and the corporation's creditors and trustee in bankruptcy also are bound by its ratification. *Pierce*, 31 Wn. App. at 218-19. Similarly, where a guarantor freely and voluntarily guarantees the payment of another, and a creditor relies to its detriment on this guaranty, the law generally requires the guaranty to be enforced; to sustain the defense of ultra vires in such a case would defeat the ends of justice. *United States Fid. & Guar. Co. v. Cascade Constr. Co.*, 106 Wash. 478, 484-85, 180 P. 463 (1919). The defense of ultra vires will "not be allowed to prevail where it would defeat the ends of justice and work a legal wrong". *U.S. Fidelity*, 106 Wash. at 483 (quoting *Railway Co. v. McCarthy*, 96 U.S. (6 Otto) 258, 267, 24 L. Ed. 693 (1877)).

Spokane Concrete's Promissory Notes of March 15, 1979 and March 27, 1986

■■ The trustee seeks to avoid the March 15, 1979, note as having been executed ultra vires and the March 27, 1986, note because it consolidated the balance of the allegedly ultra vires March 15, 1979, note without segregating liabilities. U.S. Bank argues the trustee is estopped from avoiding the March 15, 1979, promissory note because the underlying leveraged acquisition of Spokane Concrete was approved unanimously by Spokane Concrete's shareholders and because Spokane Concrete retained and used benefits obtained through the underlying transaction. U.S. Bank identifies two benefits accruing to Spokane Concrete from the March 15, 1979, promissory note: receipt of $500,000 to facilitate closure of the purchase transaction, and inheritance of REEC's $1.8 million tax loss carry-forward. While the extent of the tangible benefit received by Spokane Concrete is not clear from the record, it is clear there was at

least some benefit received. In general, under Washington law, a corporation has broad power to encumber or distribute its assets, so long as creditors of the corporation are not prejudiced thereby. RCW 23B.06.400; RCW 23B.12.010; *Zimmerman v. Kyte*, 53 Wn. App. 11, 17, 765 P.2d 905 (1988). Unless there is evidence of fraud, dishonesty, or incompetence (*i.e.*, failure to exercise proper care, skill, and diligence), courts generally refuse to substitute their judgment for that of the directors. *Seafirst Corp. v. Jenkins*, 644 F. Supp. 1152, 1159 (W.D. Wash. 1986); *Shinn v. Thrust IV, Inc.*, 56 Wn. App. 827, 834-35, 786 P.2d 285, *review denied*, 114 Wn.2d 1023 (1990). *See also Nursing Home Bldg. Corp. v. DeHart*, 13 Wn. App. 489, 498, 535 P.2d 137 (directors may take risks in the interest of their corporation so long as they comply with RCW 23B.08.300(1), which requires them to act in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner they reasonably believe to be in the best interests of the corporation), *review denied*, 86 Wn.2d 1005 (1975).

■■ Although the trustee implies otherwise, it is not inherently fraudulent for loans used for a leveraged buyout to be collateralized with the leveraged corporation's assets or for a leveraged corporation to pledge its assets to guarantee repayment of a subsequent loan. *See, e.g., Moody v. Security Pac. Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992); *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir. 1991), *cert. denied*, 503 U.S. 937, 117 L. Ed. 2d 620, 112 S. Ct. 1476 (1992); *Miller's Shoes & Clothing v. Hawkins Furniture & Appliances, Inc.*, 300 Minn. 460, 46667, 221 N.W.2d 113, 71 A.L.R.3d 629 (1974) (a corporation may obligate itself to secure the purchase price of its stock so long as the obligation serves corporate purposes and benefits the corporation). The trustee's implication that the directors' actions were fraudulent, dishonest, or incompetent is not supported by the record, which does not show that Spokane Concrete was left insolvent, with unreasonably small capital, or unable to meet its obligations to creditors as they

came due. *See Tacoma Ass'n of Credit Men v. Lester*, 72 Wn.2d 453, 457, 433 P.2d 901 (1967) (interpreting former RCW 19.40.050, which was in effect when REEC acquired Spokane Concrete); *Clearwater v. Skyline Constr. Co.*, 67 Wn. App. 305, 320-21, 835 P.2d 257 (1992) (interpreting RCW 19.40.051(a), which replaced former RCW 19.40.050), *review denied*, 121 Wn.2d 1005 (1993). The mere fact that Spokane Concrete's liabilities exceeded its assets immediately following the transaction is not dispositive, because Spokane Concrete was a going concern with prospects for the future. *See Moody*, 971 F.2d at 1067 (unless bankruptcy was clearly imminent on the date of the challenged transaction, corporate assets should be valued on a going concern basis rather than the liquidation value of corporate assets less corporate liabilities); 2 *Collier on Bankruptcy* ¶ 101.32[5], at 101-115 to 101-116 (Lawrence P. King ed. in chief, 15th ed. 1994) (citing "overwhelming authority" for the proposition assets are valued on a going concern basis under the Bankruptcy Code unless bankruptcy is imminent). Indeed, following its buyout by REEC, Spokane Concrete continued operating for 12 years before going bankrupt, the same length of time it operated before REEC acquired it.

Given these facts, the Trustee has failed to show fraud, dishonesty, or incompetence associated with Spokane Concrete's retention and use of the benefits received in exchange for the promissory note. This retention and use constitutes ratification of the promissory note. As U.S. Bank points out, Spokane Concrete also ratified its March 15, 1979, promissory note by arranging a May 8, 1985, loan consolidation, issuing a March 27, 1986, promissory note increasing the amount of the consolidated loans, and negotiating a July 24, 1990, modification agreement (Spokane Concrete's Modification Agreement). Because Spokane Concrete repeatedly ratified the promissory note, both Spokane Concrete and its trustee in bankruptcy are estopped from asserting the March 15, 1979, promissory note was executed ultra vires. *Union Fruit*, 1 Wn.2d at 284; *A.M. Castle*, 198 Wash. at 589; *Millett*, 193 Wash. at 480; *Pierce*, 31 Wn. App. at 218-19.

We therefore answer the first two questions posed by the Bankruptcy Court as follows: (a) the March 15, 1979, promissory note is enforceable against the trustee; and (b) insofar as the enforceability of the March 27, 1986, promissory note rests on the enforceability of the March 15, 1979, promissory note, the March 27, 1986, note is enforceable against the Trustee.

## Spokane Concrete's Guaranty of June 29, 1987; REEC's Modification Agreement of July 24, 1990

The trustee seeks to avoid both these obligations on the ground some of the moneys involved can be traced to the leveraged buyout. U.S. Bank argues the trustee is estopped from avoiding the June 29, 1987, guaranty because Spokane Concrete retained and used benefits obtained through the underlying transaction and separately ratified the guaranty. U.S. Bank maintains Spokane Concrete benefited from its guaranty in three ways: by receiving administrative and accounting support from REEC paid for by a loan to REEC secured by the guaranty; by consummating the Agreement in which Spokane Concrete participated in REEC's tax loss carry-forward; and by increasing the profitability of Empire Forest Products, Inc., thereby strengthening Empire Forest's cross guaranty of Spokane Concrete's debt. Although the full extent to which Spokane Concrete received these benefits is not set forth in the record, the record shows at least one clear monetary benefit flowing to Spokane Concrete from its June 29, 1987, guaranty of REEC's debt: its annual loan payments were reduced from $200,000 to $126,000. This benefit, with or without any others not defined fully in the record, was sufficiently valuable to support the guaranty.

The trustee contends the guaranty is ultra vires because it lies in the shadow cast by REEC's leveraged buyout of Spokane Concrete. As with the other challenged transactions, however, the trustee has failed to show fraud, dishonesty, or incompetence by Spokane Concrete's directors in executing its June 29, 1987, guaranty. Accordingly, Spokane

Concrete's retention and use of benefits derived from the guaranty constitutes ratification of the guaranty. By negotiating Spokane Concrete's Modification Agreement on July 24, 1990, Spokane Concrete further ratified its guaranty. These ratifications, together or separately, estop both Spokane Concrete and its trustee in bankruptcy from asserting the June 29, 1987 guaranty was executed ultra vires. *Union Fruit*, 1 Wn.2d at 284; *A.M. Castle*, 198 Wash. at 589; *Millett*, 193 Wash. at 480; *Pierce*, 31 Wn. App. at 218-19. Additionally, the record suggests U.S. Bank offered loans to REEC in reasonable reliance on Spokane Concrete's guaranty, an obligation Spokane Concrete freely and voluntarily incurred for the precise purpose of securing such loans. Such reasonable detrimental reliance by U.S. Bank constitutes a separate ground for estopping the trustee's ultra vires claims. *United States Fid. & Guar. Co. v. Cascade Constr. Co.*, 106 Wash. 478, 484-85, 180 P. 463 (1919).

REEC's Modification Agreement on July 24, 1990, was executed subject to Spokane Concrete's June 29, 1987, guaranty. Certification, at 11. Because Spokane Concrete's guaranty is enforceable, REEC's Modification Agreement is enforceable against the trustee according to the terms of the guaranty itself.

We therefore answer the third question posed by the Bankruptcy Court as follows: Spokane Concrete's June 29, 1987, guaranty is enforceable against the trustee; and REEC's Modification Agreement on July 24, 1990, is enforceable against the trustee according to the terms of Spokane Concrete's June 29, 1987, guaranty.

## CONCLUSION

The trustee's arguments are both ingenious and disingenuous. He advances a tenuous theory that REEC's leveraged acquisition of Spokane Concrete in 1978 resulted in Spokane Concrete's 1990 bankruptcy, then seeks to avoid secured claims against the bankrupt estate by relying on a section of our constitution that was not intended to apply to obligations such as those at issue here. The trustee cannot

avoid the challenged obligations under Washington law. He has not shown that Const. art. 12, § 6 was intended to prohibit the corporate obligations at issue here or that those obligations resulted from ultra vires acts by Spokane Concrete. Even if the challenged obligations resulted from ultra vires transactions, Spokane Concrete benefited from and ratified the challenged transactions, so that the trustee is estopped from asserting ultra vires as a bar to enforcement of the obligations. On the record before us, all of Spokane Concrete's challenged obligations are enforceable under Washington law against the trustee in bankruptcy.

DURHAM, C.J., UTTER, DOLLIVER, SMITH, and MADSEN, JJ., and ANDERSEN and BRACHTENBACH, JJ. Pro Tem., concur.

Reconsideration denied June 9, 1995.