JOSEPH LEONARD AND BETTY LEONARD, JOHN MOR-ROW AND PATRICIA MORROW, APPELLANTS, v. E. DAVID STOEBLING, RESPONDENT.

No. 16289

December 5, 1986                           728 P.2d 1358

[Rehearing denied January 21, 1987]

*Kenneth G. Freitas*, Las Vegas, for Appellants.

*John M. Sacco*, Las Vegas, for Respondent.

## OPINION

*Per Curiam:*

This action was originally brought by the Leonards and Morrows seeking a mandatory injunction for violation of the restrictive covenants protecting the Marina Highland Estates subdivision and for the breach of a personal agreement not to build on a portion of a building lot. Appellants allege that Stoebling's structure was wrongfully approved by the Marina Highland Estates' Architectural Control Committee and that this approval was unreasonable, arbitrary and in bad faith.

Leonard and Morrow filed a complaint for declaratory and injunctive relief seeking to define their rights under the Declaration of Protective Covenants encumbering the subdivision. They also sought to have Stoebling's ongoing construction curtailed by an injunction.

The structure in question, an addition to Stoebling's home, was approved by the Architectural Control Committee for the Marina Highlands Estates' subdivision on May 9, 1983. The history behind the approval is considerable.

Sometime in 1979, Stoebling purchased his building lot. It is located in Boulder City and is a view lot overlooking Lake Mead.

Leonard purchased a home in the subdivision in 1977 and Morrow purchased a home in 1980. All of the building lots in this subdivision were bound by the following restrictive covenant:

> C-1 Land Use and Building Type:
> All lots in said Tract No. 120 shall be used, improved and occupied in accordance with the uses prescribed by the City of Boulder Zoning Ordinance under (R-1-8) and Ordinance Classification #176. No structure on said premise shall exceed one (1) story in height, above ground level, except that the Architectural Control Committee may grant a special variance regarding two (2) story structures, *if in their opinion, such will not restrict the view and the esthetics for others within the area* (emphasis added).

In early 1980, Stoebling approached the Architectural Control Committee[1] for approval of the original construction of his home.[2] Pursuant to the instructions of the Architectural Control Committee, Stoebling also sought approval from Leonard.

Stoebling asked Leonard to sign a document giving him permission to build on his lot. Stoebling explained to Leonard that he wanted to build a two-story structure on the northeast portion of the lot, but only construct one story on the northwest corner of his lot bordering on the back part of Leonards' lot.

The document signed by Joe Leonard giving approval states the following:

> I, Joe D. Leonard, who resides at 725 Kendall Lane, Boulder City, Nevada, do not object to David Stoebling building at 729 Kendall Lane, Boulder City, Nevada, *a residence with one and one-half stories on the north east corner only,* provided that said building does not exceed the normal height of a singly family residence (emphasis added).

Stoebling accepted this from Leonard and also stated to him at the same time, "I did say to him, yes. I told him I would never block

---

[1] This is a committee of three lay individuals who approve all developments in the Marina Highland subdivision. The duties and calling of this committee are outlined in the Restrictive Covenants.

[2] Pursuant to Restrictive Covenant C-2, Mr. Stoebling was required to have his plans approved by the Architectural Control Committee:
C-2  Architectural Control:
No building shall be erected, placed or altered on any lot until the construction plans and specifications and a plan showing the location of the structure have been approved by the Architectural Control Committee as to quality of workmanship and materials, harmony of external design with existing structures, and as to location with respect to topography and finish grade elevation. No fence or wall shall be erected, placed or altered on any lot nearer to any street than the minimum building setback line unless similarly approved.

his view in the setback as long as I was his neighbor."[3] Mr. Stoebling then proceeded with the construction of the original portion of his house.

In early 1983, Stoebling decided to put an addition on his home. This addition was placed in the rear of Stoebling's property. Stoebling received permission from the Architectural Control Committee to build this addition on May 9, 1983. He was issued a building permit by the City of Boulder on June 7, 1983.

The deliberations of the Architectural Control Committee regarding Stoebling's addition are set forth in a deposition that was admitted into evidence by stipulation. The deposition reflects serious deficiencies in the deliberative process of the Architectural Control Committee.

The restrictive covenants for the subdivision instructed the Architectural Control Committee to only allow second story variances if the construction would not impact the view and aesthetics for other members of the community.[4] The following segment of the deposition illustrates the lack of adherence to these standards in the committee's fact finding process:

> Q — Okay. Did you or other members of your committee that you are aware of consider the impact that structure would have on the Leonard's or Morrow's view before you gave your approval?
> A — Frankly, the question didn't come up because it didn't appear to us that it would have an impact on the Leonard's property.[5]

No member of the Architectural Control Committee visited Leonards' property in considering whether to grant approval for the addition. The Architectural Control Committee's rationale for

---

[3]The setback area is a 20' strip in the back of all lots in the Marina Highland Estate Subdivision. No building is allowed in the setback. The record, briefs and exhibits indicated that Mr. Leonard's view of Lake Mead included looking through the setback area. This view was disturbed by Mr. Stoebling's construction, as acknowledged by the trial court.

[4]*See supra* Restrictive Covenant C-1, Land Use and Building Type.

[5]Apparently the trial court determined at trial that the Architectural Control Committee did not take the view into consideration in granting the variance:

> The record should also reflect that the Court has read the deposition [of *John N. Harman, Jr.*], the Court has reviewed the photographs and the other exhibits in evidence . . . and it's obvious that the—that the view is—is obstructed. It's obvious that the Architectural Control Committee may grant the variance that they did grant if, in their opinion, it would not restrict the view and aesthetics for others within the area. *It is also obvious from the deposition that the consideration was not looked at when the variance was given* . . . (emphasis added).

approval was prior approval, by Leonard and the earlier Architectural Control Committee, of the original structure which had a second level on the northeast portion of the property.

Ultimately, the trial court found, contrary to its pronouncement at trial and without any support in the record, that the Architectural Control Committee had taken the Leonards' and Morrows' view into consideration before granting the variance for Stoebling's addition.[6] This was error.

### Erroneous Findings of Fact

Appellants contend that reversal is mandated because the lower court's findings of fact are not supported by substantial evidence and are clearly erroneous. The record indicates that the trial court did, indeed, find facts which directly controvert the evidence admitted at trial.

The trial court found that the Architectural Control Committee had considered the impact of Stoebling's addition on the view of the lake from the properties belonging to the Leonards and Morrows. The only evidence presented to the trial court regarding the Architectural Control Committee's deliberations was the deposition of committee member John Harman. The trial court concluded at trial that there was nothing in Harmon's deposition to indicate that the Architectural Control Committee had taken Leonards' and Morrows' views into consideration, despite the court's subsequent findings of fact.[7]

The principal rationale of the Architectural Control Committee for approving Stoebling's addition, based upon Harman's deposition, was the fact that Leonard had approved the original plan for Stoebling's home by signing an agreement which indicated he would not object to Stoebling's construction on only the northeast corner of his property. The facts indicate that the Architectural Control Committee did not take the appellants' views into consid-

---

[6]The lower court makes the following finding of fact in its decision:

That in considering Defendant's request for a variance the Architectural Control Committee of Marina Highland Estates did not go on to the actual property of Plaintiffs', but were aware of its condition and the prior approval of a two (2) story structure given by plaintiff, LEONARD, to Defendant in 1980. That the Architectural Control Committee of Marina Highland Estates, in granting the variance to Defendant, considered the impact of Defendant's addition on the view of the Plaintiffs, in that they had knowledge of the actual condition on Plaintiffs' property, all in compliance with the guidelines of the Declaration of Protective Covenants for Marina Highland Estates.

For the trial court's conflicting pronouncement at trail *see supra* note 5.

[7]*See supra* note 5.

eration, nor did the committee even view the site when making its deliberations on Stoebling's addition to the original structure.

The standard for setting aside an erroneous finding of fact is found in NRCP 52(a):

> (a) *Effect.* In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

This court has stated that findings of fact "will not be disturbed on appeal if they are supported by substantial evidence." Burroughs Corp. v. Century Steel, Inc., 99 Nev. 464, 470, 664 P.2d 354, 357 (1983). In *Burroughs,* this court went on to cite NRCP 52(a) and stated that findings of fact "shall not be set aside unless clearly erroneous." *Id.* at 470, 664 P.2d at 358. This standard of review is supported in many Nevada decisions.

The evidence is clear that the Architectural Control Committee did not take the view and aesthetics of the Leonards and Morrows into consideration prior to granting permission for the Stoebling addition. The lower court, sometime during trial, misunderstood the evidence as it was presented and drafted a clearly erroneous finding of fact. The finding of fact which indicates that the Architectural Control Committee took appellants' view into consideration must therefore be set aside.

### Deficient Conclusions of Law

Appellants also challenge the trial court's conclusion of law that the Architectural Control Committee followed the guidelines specified in the restrictive covenants and that its decision was not arbitrary. Appellants' contend that the term "arbitrary" should be given a broad definition to include "bad faith and unreasonable."[8] The parties agree that the decisions of the Architectural

---

[8]Black's Law Dictionary (Rev. 4th ed. 1968) defines arbitrary in the following manner:

> Means in an "arbitrary" manner, as fixed or done capriciously or at pleasure; without adequate determining principle; not founded in the nature of things; nonrational; not done or acting according to reason or judgment; depending on the will alone; absolutely in power; capriciously; tyrannical; despotic . . . .

Control Committee were not arbitrary if they were reasonable and were in good faith. *See* Cohen v. Kite Hill Association, 191 Cal.Rptr. 209, 213-14 (1983).

Appellants maintain that the actions of the Architectural Control Committee do not show good faith or reasonableness based upon their approval of the variance without an on site inspection, without a conversation with the appellants and without consideration of the views of the Leonards or Morrows.

Stoebling suggests that although the reasonable and good faith standard is correct, that contrary to *Cohen,* the Architectural Control Committee had no specific guidelines to follow and therefore the lack of written guidance should be a factor in determining whether the Architectural Control Committee's conduct was arbitrary, unreasonable or in bad faith. The restrictive covenants, however, indicate that the Architectural Control Committee had *one important guideline.* This was to ensure that no new construction or additions blocked the view or damaged the aesthetics of other residents in the subdivision. The committee failed to adhere to this paramount guideline.

Our review of the record conclusively reveals that the Architectural Control Committee gave no heed to the impact of the Stoebling addition on appellants' view of the lake. The committee's perfunctory deference to its prior approval of the original structure presented no basis for a meaningful exercise of its function to assure a perpetual lake view advantage to appellants and the other residents who had constructed homes within the unique setting of the subdivision. At minimum, the committee members should have visited the proposed construction site and ascertained its impact on appellants' properties. The committee's failure to undertake such a minimum effort is unreasonable per se. The product of the committee's inaction and disregard for appellants' rights was an arbitrary decision that warranted injunctive relief by the trial court.

### The Injunctive Remedy

Stoebling makes several arguments why an injunction would be an inappropriate remedy. First, he suggests that because he complied with all of the policies and procedures required for a variance, that he did not violate the restrictive covenant by receiving approval for his structure. This argument has some surface appeal, but is specious when analyzed in light of the facts and the competing equities.

Stoebling promised not to obstruct the Leonards' view. He nevertheless proceeded with new construction that he realized would block the Leonards' view in violation of his commitment. The Architectural Control Committee could not have made a

good faith determination based upon the guidelines regarding views and aesthetics if it had been privy to Stoebling's promise. In any event, the committee did not comply with the overriding concern of the covenants when it failed to take appellants' view into consideration. Either the committee purposely allowed Stoebling to violate the covenants, or the committee was so inept in reaching its decision that it unknowingly approved Stoebling's intentional violation of the covenants.

[Headnote 4]

Next, Stoebling cites Drulard v. LeToiurneau, 593 P.2d 1118 (Ore. 1979), for the proposition that a court should not impose a mandatory injunction in a case such as the instant one because if Stoebling had chosen to build a one-story house up to the maximum height limit, 25 feet in Boulder City, that he would not have had to acquire a variance (they are only required for two-story houses) and that this would have had a much greater impact on Leonards' view. Therefore, he concludes, since appellants were potentially subject to a 25-foot-high one-story structure, equity should not enjoin the construction of a two-story 18 foot high home, even if the required approval process was flawed.

This reasoning lacks merit. All construction, original or additions, had to be approved by the Architectural Control Committee. Variances are only required for second story additions. The committee could not have approved a 25 foot single story home next to the Leonards and been in harmony with the requirements of the restrictive covenants.[9]

Lastly, Stoebling contends that the degree of injury to appellants is insufficient to warrant a mandatory injunction. He asserts that the Leonards and Morrows should have sought money damages, but that none were alleged and therefore none can be awarded. An Oregon court made a cogent observation regarding the value of a view in Glover v. Santangelo, 690 P.2d 1083, 1086 (Or.Ct.App. 1984):

> A view is a unique asset for which a monetary value is very difficult to determine. Plaintiff testified that the view was a crucial factor in their decision to buy the home . . . . Defendant's position is made weaker by the fact that he purchased with full knowledge of the covenant. He was therefore, [sic] obligated to comply with it. . . . Accordingly we hold that plaintiffs are entitled to have the illegally obstructed portion of their view restored.

The situation is virtually the same in the instant case.

Mandatory injunctions are used to restore the status quo, to

---

[9]*See supra* note 2.

undo wrongful conditions. A court should exercise restraint and caution in providing this type of equitable relief. However, mandatory injunctions have been sanctioned in the recent past to accomplish the restoration of the status quo in such matters as water rights, Memory Gardens of Las Vegas v. Pet Ponderosa M.G., 88 Nev. 1, 492 P.2d 123 (1972), and the reconstruction of roadway, City of Reno v. Matley, 79 Nev. 49, 378 P.2d 256 (1963).

In balancing the equities and considering the circumstances noted above, we have concluded that the judgment below must be reversed and a mandatory injunction issued.

A mandatory injunction is a stern remedy. It is therefore incumbent upon the trial court upon remand, to structure the injunction so as to accomplish the restoration of appellants' view with the least degree of detriment to respondent. However, if a modification of respondent's addition will not achieve the status quo, then the offending structure must be removed in its entirety.