934 P.2d 669 (1997)
131 Wash.2d 612
William J. RISS and Carolyn Riss, husband and wife, Respondents,
v.
Lee and Margie ANGEL, husband and wife, and their marital community, Defendants,
Bruce and Bev Attebery, husband and wife, and their marital community, Petitioners,
Tim and Leslie Banks, husband and wife, and their marital community; Lou and Doris Berg, husband and wife, and their marital community; Stanley and Jackie Berman, husband and wife, and their marital community, Defendants,
John and Cathy Coart, husband and wife, and their marital community; Ed and Arline DeGroot, husband and wife, and their marital community, Petitioners,
Bob and Patty Edwards, husband and wife, and their marital community; Phelps and Christel Fisher, husband and wife, and their marital community; Larry and Jan Granston, husband and wife, and their marital community, Defendants,
Jerry and Helen Greenan, et ux., Petitioners,
Lloyd and Karen Hammel, husband and, wife, and their marital community; William and Pamela Hay, husband and wife, and their marital community; James and Christine Hillman, husband and wife and their marital community, Defendants,
Kathy Hodge, a single person; Ron Levite, a single person, Petitioners,
Eleanor Long, a single person; Morgan and Clarinda Marshall, husband and wife, and their marital community, Defendants,
Fred and Betty Maxam, husband and wife, and their marital community; V.O. and Lucy McDole, husband and wife, and their marital community, Petitioners,
Stewart and Maxine Neel, husband and wife, and their marital community; Bill and Shirley Nodell, husband and wife, and their marital community; Don and Linda Reid, husband and wife, and their marital community, Defendants,
Bruce Ries and Marilyn Donogh-Ries, Petitioners,
Kurt and Ilse Ries, husband and wife, and their marital community; Barry and Julie Scott, husband and wife, and their marital community; Beverly Tufarolo, a single person; Rodney and Nina Waldbaum, husband and wife, and their marital community; Defendants,
Robert and Marian Webb, husband and wife, and their marital community; individually and collectively doing business as Mercia Corporation, Petitioners.
No. 63898-5.
Supreme Court of Washington, En Banc.
Argued October 22, 1996.
Decided April 10, 1997.
*672 Law Offices of J. Richard Aramburu, J. Richard Aramburu, Jeffrey M. Eustis, Seattle, for Petitioners.
Tousley & Brain, Christopher I. Brain, Seattle, Kimberly J. Kernan, Golden, CO, for Respondents. *670
*671 MADSEN, Justice.
Members of the Mercia Heights homeowners association rejected Plaintiffs' building *673 plans under a consent to construction clause in the subdivision's restrictive covenants. The trial court held that the association's rejection of the plans was unreasonable and arbitrary. The trial court further held the members jointly and severally liable for delay damages and attorney fees. The Court of Appeals affirmed and the homeowners sought review. We likewise affirm, but remand for determination of which individual association members shall be jointly and severally liable.
In 1992, Plaintiffs William and Carolyn Riss purchased lot 6 in Mercia Heights, a residential subdivision in Clyde Hill. The subdivision is subject to restrictive covenants recorded by the developer, which provide that new construction and remodeling must be approved by the Mercia Corporation, originally a nonprofit corporation consisting of the homeowners in the development. The corporation was administratively dissolved in 1985, and the subdivision is now governed by the homeowners as an unincorporated homeowners association which acts through an elected board of directors. The Mercia development includes many homes built in the 1950s which are one level or split-level ramblers. Many of the lots, which vary in shape, size, and slope, have distant views of Lake Washington, the Seattle skyline, and the Olympic Mountains.
The covenants, in existence since the 1950's, contain express restrictions on minimum square footage of residences, minimum setback requirements, and maximum roof heights, providing for homes with a minimum of 1,400 square feet and roof lines no higher than 20 feet above the highest point of finished grade on the lot. Paragraph 6 of the covenants provides that
As to improvements, construction and alterations in Mercia Heights addition, the... Mercia Corporation shall have the right to refuse to approve the design, finishing or painting of any construction or alteration which is not suitable or desirable in said addition for any reason, aesthetic or otherwise ... [considering] harmony with other dwellings ... the effect on outlook of adjoining or neighboring property and any and all other factors which in their opinion shall affect the desirability or suitability of such proposed structure, improvement or alterations.
Clerk's Papers (CP) at 503. The covenants give the board of directors enforcement power and the authority to approve or disapprove construction or remodeling. The covenants provide that any lot owner may sue to enforce the covenants and the prevailing party is entitled to reasonable attorney fees and costs. In 1990, the covenants were amended to provide that a property owner aggrieved by a Board decision may appeal to the Mercia homeowners, who will meet and decide by majority vote, with proxies allowed, whether to overturn the Board's decision. Another amendment proposed in 1990 would have limited the height of new construction to the height of the existing dwelling on the lot unless written approval of a higher roof line was granted by the association. This amendment failed.
Plaintiffs wanted to remove the existing dwelling on lot 6 and construct a one-story home with a daylight basement. Plaintiffs submitted their plans to the homeowners' designee for covenant compliance and review. They were told that except in minor respects their plan satisfied the covenants. Plaintiffs knew the covenants required approval of the Board and the homeowners.
Following November meetings where the Board and homeowners discussed Plaintiffs' proposed plans, an open Board meeting was held December 9, 1992, to consider Plaintiffs' plans. Prior to this meeting, the president of the homeowners association and his wife took photographs holding poles in front of various Mercia residences to show how high 23 feet was as referenced against existing dwellings. A montage of these photographs was presented at the meeting. The trial court found this photographic study lacked precision, failed to take into account either the height restriction of the covenants or the City of Clyde Hill's height restrictions (measured from the original topography), and were inaccurate and misleading as to the effect of Plaintiffs' proposed residence. Plaintiffs' plans called for a roof height within the maximum restrictive covenant height of 20 feet above the highest point of finished grade *674 on a lot; the proposed residence would have a roof height 11½ feet above the highest point of finished grade, some five feet higher than the existing structure. Also prior to the meeting, another Board member sent a letter to all other lot owners expressing concerns with Plaintiffs' plans and, the trial court found, inaccurately representing the height and square footage of the proposed residence. See Exhibit 38.
Following the meeting, Plaintiffs were notified that the Board had rejected their plans. The Board's rejection was based upon the height of the structure, its bulk (width and depth), the design exterior finish, and proximity to neighboring houses. The letter notifying Plaintiffs of the rejection also explained that the Board was "not comfortable with giving specific guidelines at this time," and that "an arbitrary disapproval without any guidance would not be constructive." Exhibit 16. The Board said it would hire an architect to assist in describing guidelines that would allow Plaintiffs to design and construct a home on their property.
The architect the Board then consulted calculated the mass of the proposed home by adding square footage of the exterior surface walls when viewed in a plane, excluding the courtyard. This method was not communicated to Plaintiffs, and no comparison of their proposed home to other homes was made using this method. The architect recommended that a volume comparison be done, but none was made. On December 30, 1992, the Board president wrote to Plaintiffs, advising them of specific guidelines to aid in redesigning the house. The first required the roof line to remain at the same level as the existing structure to preserve views. The Board had never performed any view study or analysis, and Plaintiffs' evidence showed the proposed residence would not appreciably block views. The second guideline called for a 20 percent reduction in width and depth. Plaintiffs say this would result in a residence smaller than the existing residence. The sixth guideline concerned the width of the proposed residence; however, the proposed residence was 5 feet narrower than the existing residence. The remaining guidelines are not the subject of disagreement.
Testimony at trial also established that members of the homeowners association were concerned that lot 6 was special, or more visible to those entering the community.
Plaintiffs appealed the Board's decision to the homeowners. On January 2, 1993, the Board president wrote to the other Board members, urging them to assure a large turnout for the vote on Plaintiffs' appeal, or to vote by proxy, so that Plaintiffs would not be able to sway a small turnout. See Exhibit 40.[1] On January 8, 1993, the Board president wrote a letter to the owners advocating a vote against approval of Plaintiffs' plans at the January 18, 1993, meeting set to consider Plaintiffs' appeal. The homeowners voted against approval of Plaintiffs' plans. Defendants state that 24 of the 34 lot owners cast votes themselves or by proxy, and that the vote was 21-3 to reject Plaintiffs' proposal.
Plaintiffs brought this action against the homeowners individually, contending that the covenants were not enforceable, and, alternatively, that their plans complied with the covenants and the Board and association acted unreasonably in rejecting their plans. Five of the lot owners signed stipulations indicating they would not oppose Plaintiffs' proposed residence and they agreed to be bound by the court's decision. The remaining lot owners were defendants at trial.
The court ruled the covenants are binding, but it found the association acted unreasonably in rejecting Plaintiffs' plans. The court concluded that the covenants as written are reasonable, but do not permit the homeowners to impose restrictions more burdensome than those expressed in the covenants. Specifically, the court said that the homeowners *675 could not restrict size, height, and proximity to neighbors beyond the minimum square footage and the maximum height restrictions, and the setback requirements set out in the covenants. The court concluded that paragraph 6's discretionary authority to reject proposals on the basis of design cannot be read as including authority to limit "bulk," i.e., size or scale. CP at 1633. The court concluded the association does have wide discretion to control design aesthetics, which the court reasoned included authority to reject, for example, a geodome, A-frame, or Tudor castle. The court also rejected the homeowners' concerns that lot 6 is special, saying that if special restrictions on a specific lot were desired, the covenants must clearly say so.
The court also concluded that the association acted unreasonably because it rejected Plaintiffs' plans without comparing the width and depth of other homes in the neighborhood to Plaintiffs' proposed residence, failed to thoroughly investigate, and relied upon inaccurate information.
The court ruled in favor of the association, however, on its rejection of the proposed exterior, Dryvit.
The court entered judgment declaring that Plaintiffs could build their proposed home, provided that they change the exterior finish to one reasonably specified by the association. Following trial on damages, which had been bifurcated from the liability issues, the court awarded Plaintiffs delay damages of $103,989.85, and attorney fees and costs of $102,250.31. The judgment was entered against the individual defendant homeowners jointly and severally.
The homeowners appealed. However, many of them subsequently moved to be dismissed from the appeal, and the Court of Appeals granted the motion. The remaining homeowners, the Appellants, are listed in the margin.[2] The Court of Appeals affirmed. Riss v. Angel, 80 Wash.App. 553, 912 P.2d 1028 (1996). Appellants then petitioned for review, which this court granted.

Construction of Restrictive Covenants in General
The court's primary objective in interpreting restrictive covenants is to determine the intent of the parties. Metzner v. Wojdyla, 125 Wash.2d 445, 450, 886 P.2d 154 (1994); Mains Farm Homeowners Ass'n v. Worthington, 121 Wash.2d 810, 815, 854 P.2d 1072 (1993); Lakes at Mercer Island Homeowners Ass'n v. Witrak, 61 Wash.App. 177, 179, 810 P.2d 27, review denied, 117 Wash.2d 1013, 816 P.2d 1224 (1991). In determining intent, language is given its ordinary and common meaning. Metzner, 125 Wash.2d at 450, 886 P.2d 154; Mains Farm, 121 Wash.2d at 815, 854 P.2d 1072; Krein v. Smith, 60 Wash.App. 809, 811, 807 P.2d 906, review denied, 117 Wash.2d 1002, 815 P.2d 266 (1991). The document is construed in its entirety. Mountain Park Homeowners Ass'n, Inc. v. Tydings, 125 Wash.2d 337, 344, 883 P.2d 1383 (1994); Burton v. Douglas County, 65 Wash.2d 619, 622, 399 P.2d 68 (1965). The relevant intent, or purposes, is that of those establishing the covenants. Robert G. Natelson, Law of Property Owners Associations § 2.5, at 61 (1989).
Historically, Washington courts have also held that restrictive covenants, being in derogation of the common law right to use land for all lawful purposes, will not be extended to any use not clearly expressed, and doubts must be resolved in favor of the free use of land. E.g., Burton, 65 Wash.2d at 622, 399 P.2d 68 (citing Granger v. Boulls, 21 Wash.2d 597, 152 P.2d 325, 155 A.L.R. 523 (1944)); Bersos v. Cape George Colony Club, 10 Wash.App. 969, 971, 521 P.2d 1217 (1974) (same); Fairwood Greens Homeowners Ass'n, Inc. v. Young, 26 Wash.App. 758, 761-62, 614 P.2d 219 (1980) (same). The Court of Appeals in this case applied the rule of strict construction against the drafter, reasoning that the homeowners are the drafters because they amended the covenants in 1990.
Washington courts have begun to question whether rules of strict construction should be applied where the meaning of a subdivision's *676 protective covenants are at issue and the dispute is among homeowners.
Construction against the grantor who presumably prepared [a] deed is quite a different matter from construction of covenants intended to restrict and protect all the lots of a plat and future owners who buy and build in reliance thereon.
....
The premise that protective covenants restrict the alienation of land and, therefore, should be strictly construed may not be correct. "Subdivision covenants tend to enhance, not inhibit, the efficient use of land.... In the subdivision context, the premise [that covenants prevent land from moving to its most efficient use] generally is not valid."
Mains Farm, 121 Wash.2d at 816, 854 P.2d 1072 (citation omitted). The Court of Appeals has similarly observed:
While restrictive covenants were once disfavored by the courts, upholding the common law right of free use of privately owned land, modern courts have recognized the necessity of enforcing such restrictions to protect the public and private property owners from the increased pressures of urbanization.

Lakes at Mercer Island Homeowners Ass'n, 61 Wash.App. at 179, 810 P.2d 27; accord, e.g., Thayer v. Thompson, 36 Wash.App. 794, 797, 677 P.2d 787 (also noting that as public restrictions in the form of zoning had gained favor, so had private restrictions), review denied, 101 Wash.2d 1016 (1984).
Other courts have refused to apply principles of strict construction in construing restrictive covenants. For example, since 1958 the Kentucky courts have regarded restrictive covenants "more as a protection to the property owner and the public rather than as a restriction on the use of property" and decline to apply "the old-time doctrine of strict construction[.]" Highbaugh Enter. Inc. v. Deatrick & James Constr. Co., 554 S.W.2d 878, 879 (Ky.Ct.App.1977) (citing Brandon v. Price, 314 S.W.2d 521 (Ky.1958)). Twenty years ago New Hampshire noted that "[t]he former prejudice against restrictive covenants which led courts to strictly construe them is yielding to a gradual recognition that they are valuable land use planning devices." Joslin v. Pine River Dev. Corp., 116 N.H. 814, 367 A.2d 599, 601 (1976) (citing 7 G. Thompson, Real Property § 3158 (J. Grimes ed. Supp.1976)). The court observed that "private land use restrictions `have been particularly important in the twentieth century when the value of property often depends in large measure upon maintaining the character of the neighborhood in which it is situated.'" Joslin, 367 A.2d at 601 (quoting Traficante v. Pope, 115 N.H. 356, 341 A.2d 782, 784 (1975)). The court rejected the principle that restrictive covenants are to be strictly construed in favor of the free use of land.
As indicated, in Washington the intent, or purpose, of the covenants, rather than free use of the land, is the paramount consideration in construing restrictive covenants. Moreover, both this court and the Court of Appeals have refused to apply principles of strict construction so as to defeat the plain and obvious meaning of restrictive covenants. Mains Farm, 121 Wash.2d at 816, 854 P.2d 1072; Lakes at Mercer Island Homeowners Assoc., 61 Wash.App. at 180, 810 P.2d 27; Fairwood Greens, 26 Wash. App. at 762, 614 P.2d 219 (citing Rush v. Miller, 21 Wash.App. 156, 584 P.2d 960 (1978); 20 Am.Jur.2d Covenants, Conditions, and Restrictions § 187 (1965)).
The time has come to expressly acknowledge that where construction of restrictive covenants is necessitated by a dispute not involving the maker of the covenants, but rather among homeowners in a subdivision governed by the restrictive covenants, rules of strict construction against the grantor or in favor of the free use of land are inapplicable. The court's goal is to ascertain and give effect to those purposes intended by the covenants. Ambiguity as to the intent of those establishing the covenants may be resolved by considering evidence of the surrounding circumstances. Mountain Park Homeowners Ass'n, Inc., 125 Wash.2d at 344, 883 P.2d 1383; Burton, 65 Wash.2d at 622, 399 P.2d 68. The court will place "special emphasis on arriving at an interpretation that protects the homeowners' collective interests." *677 Lakes at Mercer Island Homeowners Assoc., 61 Wash.App. at 181, 810 P.2d 27.

Specific v. General Restrictive Covenants
The trial court and the Court of Appeals held that in light of the specific covenants respecting square footage, setback and height, the association lacked authority to impose more burdensome requirements under paragraph 6. Neither court held that paragraph 6 is invalid.
Covenants providing for consent before construction or remodeling have been widely upheld, even where they vest broad discretion in a homeowners association or a committee or board through which it acts, so long as the authority to consent is exercised reasonably and in good faith. E.g., Hannula v. Hacienda Homes, Inc., 34 Cal.2d 442, 211 P.2d 302, 19 A.L.R.2d 1268 (1949); Rhue v. Cheyenne Homes, Inc., 168 Colo. 6, 449 P.2d 361 (1969); Alliegro v. Home Owners of Edgewood Hills, Inc., 35 Del.Ch. 543, 122 A.2d 910 (1956); Winslette v. Keeler, 220 Ga. 100, 137 S.E.2d 288 (1964); McNamee v. Bishop Trust Co., Ltd., 62 Haw. 397, 616 P.2d 205 (1980); Oakbrook Civic Ass'n, Inc. v. Sonnier, 481 So.2d 1008 (La.1986); Donoghue v. Prynnwood Corp., 356 Mass. 703, 255 N.E.2d 326, 40 A.L.R.3d 858 (1970); Kirkley v. Seipelt, 212 Md. 127, 128 A.2d 430 (1957); LeBlanc v. Webster, 483 S.W.2d 647 (Mo.Ct. App.1972); Raintree Homeowners Ass'n, Inc. v. Bleimann, 342 N.C. 159, 463 S.E.2d 72 (1995); Syrian Antiochian Orthodox Archdiocese v. Palisades Assocs., 110 N.J.Super. 34, 264 A.2d 257 (1970); Palmetto Dunes Resort v. Brown, 287 S.C. 1, 336 S.E.2d 15 (1985); see generally John D. Perovich, Annot., Validity and Construction of Restrictive Covenant Requiring Consent to Construction on Lot, 40 A.L.R.3d 864 (1971 & Supp.). The Court of Appeals has similarly reasoned that consent to construction covenants must be reasonable and reasonably exercised to be valid. Thayer v. Thompson, 36 Wash.App. 794, 797, 677 P.2d 787, review denied, 101 Wash.2d 1016 (1984); cf. Shafer v. Board of Trustees of Sandy Hook Yacht Club Estates, Inc., 76 Wash.App. 267, 883 P.2d 1387 (1994), review denied, 127 Wash.2d 1003, 898 P.2d 308 (1995).
Approval standards like "`conformity and harmony of external design and general quality with the existing standards of the neighborhood[,]'" and "`location of the building with respect to topography and finished ground elevations'" have been upheld where covenants with such standards clearly established that discretion to approve had been granted. Winslette, 137 S.E.2d at 289-90. However, such a standard will not be enforced where it has been applied so inconsistently as to result in a wide variety of buildings. See, e.g., Town & Country Estates, Ass'n v. Slater, 227 Mont. 489, 740 P.2d 668, 669 (1987) ("harmony of external design" too vague to be enforceable where development was a cacophony of styles).
Courts have also held enforceable sets of restrictive covenants which have both objective specific covenants and a general consent to construction covenant. E.g., Clark v. Rancho Santa Fe Ass'n, 216 Cal. App.3d 606, 265 Cal.Rptr. 41 (1989); Alpenwald Improvement Corp. v. Kelly, 153 Vt. 405, 571 A.2d 624 (1989). Specific, objective restrictive covenants involve primarily a nondiscretionary, ministerial procedure. Alliegro, 122 A.2d at 912.
We agree with the majority of courts that covenants providing for consent before construction or remodeling will be upheld so long as the authority to consent is exercised reasonably and in good faith. However, several courts have held that a consent to construction covenant cannot operate to place restrictions on a lot which are more burdensome than those imposed by the specific covenants. Bass v. Helseth, 116 Cal. App.2d 75, 253 P.2d 525, 36 A.L.R.2d 853 (1953) (specific setback requirements); Seabreak Homeowners Ass'n, Inc. v. Gresser, 517 A.2d 263 (Ct. Ch.1986) (same), aff'd, 538 A.2d 1113 (1988); Davis v. Huey, 620 S.W.2d 561 (Tex.1981). We agree. If covenants include specific restrictions as to some aspect of design or construction, the document manifests the parties' intent that the specific restriction apply rather an inconsistent standard *678 under a general consent to construction covenant.
In this case, the specific size, setback, and height requirements are in terms of minimums and maximums. The consent to construction covenant provides that the Board is to consider "harmony with other dwellings ... the effect on outlook of adjoining or neighboring property and any and all other factors which in their opinion shall affect the desirability or suitability of such proposed structure, improvement or alterations." Ex. 2, para. 6. The specific restrictions do not foreclose consideration of size and bulk under the more general provision. For example, if all the homes in the neighborhood have 2,000 to 3,000 square feet, a proposed home of 7,000 square feet, while consistent with the minimum 1,400 square feet required by the covenants, would be inharmonious with the development. Minimum requirements, if satisfied, do not mean that anything else goes so far as size and bulk are concerned. We construe these covenants to mean that the minimums must be satisfied, i.e., the Board has no discretion to permit anything smaller than a 1,400 square foot house or one having a height over 20 feet above the highest finished grade on the lot, but the Board does have discretion, for example, as to maximum size. This interpretation accords with the plain and ordinary language used, and rests on the premise that the specific covenants are not inconsistent with exercise of discretion as to size and height so long as the specific minimums and maximums are satisfied.
Moreover, we disagree with the trial court's conclusion that approval of "design" refers only to matters other than placement on the lot, size, and height in this set of covenants. "Design" commonly involves the whole of a structure, including size, configuration and height. See, e.g., Random House Unabridged Dictionary 539 (2d ed. 1993) ("design" includes a "plan, as of the form and structure of ... an edifice ... to be ... constructed" as well as "the combination of details or features of a ... building").[3]
Accordingly, the homeowners association had discretion to consider size, height, and proximity to neighbors in deciding whether to approve Plaintiffs' proposed residence.

Whether Exercise of Discretion Reasonable
The homeowners argue they acted in good faith and therefore cannot be held to have violated the covenants. The trial court did not enter findings or conclusions on the good or bad faith of the homeowners. Regardless of the good or bad faith of the homeowners, however, a decision under a consent to construction covenant must be reasonable.
In examining whether rejection of a proposal is reasonable, courts have identified a number of factors which demonstrate unreasonable decisionmaking. Among other things, courts have found decisions unreasonable where there was no evidence in the record as to external design of any other structures in the subdivision aside from the applicant's residence and the record showed merely conclusory statements of the chairman of an architectural control committee that the proposed residence was not harmonious with surrounding structures. Oakbrook Civic Ass'n, 481 So.2d 1008. Also unreasonable was the failure to take neighbors' views into consideration as required, evidenced in part by an architectural control committee's failure to even view the site when deliberating on approval of an applicant's proposed addition. Leonard v. Stoebling, 102 Nev. 543, 728 P.2d 1358 (1986). Further, unreasonable rejection of a building plan was found where there were two modern houses in a predominantly traditional subdivision, the applicant's nontraditionally styled home was not detrimental to the neighborhood, and the grantor would have approved the plans but for objections of neighbors whose houses were not depreciated *679 in value by the building of the house. Donoghue, 255 N.E.2d at 329.
In this case, the Board's decision reflected in the letter to Plaintiffs was in conclusory language about height, bulk, and proximity. An architect was consulted only after the decision was made. Three of the specific guidelines from the Board reflect unreasonable decisionmaking (reduction in roofline to preserve views where views were not appreciably affected by the proposed structure, reduction in size to less than the existing structure, and reduction in width to reflect the shapes of other homes where the proposed structure was fine but narrower than the existing structure).
Although view was allegedly a major concern, there is no evidence that the Board reasonably assessed the impact of Plaintiffs' proposed structure. Instead, the homeowners were presented with a misleading photo montage about the impact of Plaintiffs' plans. There is no evidence the Board visited the site, much less with a eye to neighbors' views or privacy. There is no evidence in the record that the Board made any objective comparisons with existing homes to compare size and height, though those were major reasons for rejecting the proposed plans. The trial court's finding that the Board president's photo montage was inaccurate and misleading is supported by the evidence. Its finding that another board member wrote a letter to homeowners inaccurately stating the height and size of the proposed structure is also supported by the evidence. While the height stated in this letter, a ridge height of 25 feet, was taken from structural plans, that height had nothing to do with the covenant restriction based upon measurement from the highest finished grade of the lot. These lobbying efforts by board members demonstrate less than a fair assessment of Plaintiffs' proposed structure.
Objections of neighbors should not be discouragedthat is often how restrictive covenants are enforcedbut two of the board members inaccurately representing the impact of the structure is not part of a reasonable decisionmaking process.[4] The trial court correctly concluded that the homeowners unreasonably and arbitrarily rejected Plaintiff's proposed building plans.

Evidence Considered by Trial Court
The homeowners maintain that the trial court erroneously considered evidence which was not before the homeowners when they made their decision.
The homeowners argue that the court should not substitute its judgment for that of the Board. We agree, particularly where a consent to construction covenant permits a decision based upon standards such as aesthetics and harmony with the neighborhood, as paragraph 6 does. Although such standards permit reasonable differences about whether a house is aesthetically appropriate, such covenants may be unambiguous in leaving the determination to the homeowners association, which under the majority rule is constrained only to exercise its judgment reasonably and in good faith. See Palmetto Dunes, 336 S.E.2d at 19; Bennett v. Huwar, 748 S.W.2d 777 (Mo.Ct.App. 1988); cf. McHuron v. Grand Teton Lodge Co., 899 P.2d 38 (Wyo.1995) (language of covenants vested determination of whether proposal was in keeping with the surrounding landscape and natural beauty of the area in committee; court limited to addressing reasonableness of committee's action).
Nonetheless, in reviewing a homeowners association's decision under a consent to construction covenant, the court is obliged to determine whether that decision was properly made. See Robert G. Natelson, Law of Property Owners Associations § 5.2, at 173 (1989) ("[a]s with questions of substantive validity, a court may examine the fact-finding and other procedures undertaken by association officials in the course of judicial determination of whether the association's [ad hoc decision on architectural plans] is reasonable"). The trial court here found *680 the homeowners' decision was unreasonable and arbitrary because their decision was made without comparing the proposed home with other homes in the neighborhood and "without a thorough investigation and upon inaccurate information." CP at 1634. These conclusions were based in part on testimony of Plaintiffs' expert who made a comparison study between Plaintiffs' proposed structure and other homes in the Mercia development. This evidence tends to show that had the association made valid comparisons of its own, its decision might have been different. Coupled with the lack of record evidence showing any legitimate comparisons with existing homes under the standard "harmony with other dwellings," Plaintiffs' evidence supported their claim of arbitrary, unreasonable decisionmaking. Ex. 2, para. 6. Further, evidence of the circumstances surrounding the decision, such as the two Board members' misleading campaigns against Plaintiffs' proposed residence, also tends to show unreasonable decisionmaking.
Thus, contrary to the homeowners' argument, the evidence was not admissible as a basis for the court to substitute its judgment for that of the homeowners association, but for the purpose of determining whether its decision was reasonable. There was no error in admitting the evidence.

Liability of Individual Association Members
The homeowners maintain that the trial court erred in awarding delay damages and attorney fees and costs to Plaintiffs and that even if Plaintiffs were entitled to such an award, it should not have been entered jointly and severally against each of the individual defendant homeowners.
The homeowners first argue that the covenants provide for a damages award only in the event that property owners "violate or attempt to violate" the covenants. Ex. 2, para. 21. Here, they reason, they simply exercised their good faith judgment when deciding Plaintiffs' appeal from the Board's decision. As explained above, however, good faith is not the sole criteria for exercise of discretion under a consent to construction covenant. The rejection of Plaintiffs' proposal was unreasonable and arbitrary and in violation of the covenants.
The homeowners also argue that a decision under the consent to construction covenant should be assessed under standards applicable to satisfaction contracts. We disagree. Regardless of the subjective assessment of the Board and the homeowners about the desirability of a proposal, the homeowners are not entitled to reject a proposal unless their decision is reasonable and in good faith.
The homeowners also rely upon the business judgment rule, under which they argue personal liability will not be found based upon a decision made within the authority of the association and made without bad faith or corrupt motive. The role of the business judgment rule where homeowners associations is concerned is the subject of ongoing debate. Compare Robert G. Natelson, Law of Property Owners Associations § 10.3.3.2, at 443 (1989) (arguing that the business judgment rule is inapplicable to property owners' associations, in part because such associations are not in existence to engage in entrepreneurship, or to take risks in hope of profits) with Wayne S. Hyatt, Condominium and Homeowner Association Practice: Community Association Law § 3.09(a), at 71-73 (2d ed. 1988) (stating that officers and directors of a community association must observe the business judgment rule).
Some of the dispute centers on how the business judgment rule is defined. In Schwarzmann v. Association of Apartment Owners, 33 Wash.App. 397, 655 P.2d 1177 (1982), where a condominium owner sued the condominium board members for damages allegedly resulting from the board's failure to remedy a water problem, the court relied on a definition of the business judgment rule which said that directors will not be liable for honest mistakes, even if the errors are so gross as to demonstrate the unfitness of the directors to manage corporate affairs. Id. at 402, 655 P.2d 1177.
However, the court in Schwarzmann went on to say that, like their corporate counterparts, condominium directors have a fiduciary duty to exercise ordinary care in *681 performing their duties and to act reasonably and in good faith. Id. at 403, 655 P.2d 1177.[5] Other cases, Natelson points out, have similarly applied an ordinary care standard while stating reliance upon the business judgment rule. Natelson, § 10.3.3.2, at 444-45 (citing cases). Thus, whether or not the business judgment rule should be applied to property owners associations, the decisions of these associations must be reasonable.
This court has said that a court will not substitute its judgment for that of corporate directors "[u]nless there is evidence of fraud, dishonesty, or incompetence (i.e., failure to exercise proper care, skill, and diligence)[.]" In re Spokane Concrete Prods., Inc., 126 Wash.2d 269, 279, 892 P.2d 98 (1995) (emphasis added). Reasonable care is required. Id. (citing Nursing Home Bldg. Corp. v. DeHart, 13 Wash.App. 489, 498, 535 P.2d 137, review denied, 86 Wash.2d 1005 (1975)). The Court of Appeals extensively discussed Washington's business judgment rule in Shinn v. Thrust IV, Inc., 56 Wash.App. 827, 833-35, 786 P.2d 285, review denied, 114 Wash.2d 1023, 792 P.2d 535 (1990). Among other things, the court concluded that good faith is insufficient because a director must also act with such care as a reasonably prudent person in a like position would use under similar circumstances.
In light of the cases discussed above, it is clear that the rule if applied here would not exonerate the homeowners for their unreasonable decision to reject Plaintiffs' proposal. At the least, their failure to adequately investigate would remove them from the rule's insulating effect.
The homeowners also argue that neither damages nor attorney fees and costs are awardable except where individual lot owners violate the covenants, and that the unincorporated association of homeowners is not a lot owner. The covenants provide that "[i]f any of the lot owners ... shall violate or attempt to violate any of the provisions of these restrictive mutual easements" it shall be lawful for "any other person or persons owning real property" in the Mercia subdivision or the "Mercia Corporation" to sue to enforce the covenants. CP at 505.
Contrary to the homeowners' argument, this provision contemplates an award of attorney fees and damages in a case like this one. The members of the unincorporated association are lot owners and may be liable for their actions in violation of the covenants.
The homeowners also point out that under the covenants attorney fees are awardable only to a prevailing party. They argue that they are substantially prevailing parties because the trial court upheld the validity of the covenants and their decision that Plaintiffs had to change the exterior finish of the proposed structure from Dryvit to some natural material acceptable to the homeowners.
In general, a prevailing party is one who receives an affirmative judgment in his or her favor. Schmidt v. Cornerstone Invs., Inc., 115 Wash.2d 148, 164, 795 P.2d 1143 (1990). If neither wholly prevails, then the determination of who is a prevailing party depends upon who is the substantially prevailing party, and this question depends upon the extent of the relief afforded the parties. Marassi v. Lau, 71 Wash.App. 912, 916, 859 P.2d 605 (1993); Rowe v. Floyd, 29 Wash.App. 532, 535 n. 4, 629 P.2d 925 (1981). Plaintiffs will essentially be able to build the house they sought to have approved. The trial court correctly concluded that that Plaintiffs are prevailing parties.
The homeowners also argue that the judgment should not have been entered jointly and severally against all of the individual defendant homeowners because not all of the *682 defendant homeowners voted to reject Plaintiffs' proposal. They contend that only those who did so vote should be liable, that the burden is on Plaintiffs to establish who voted against them, that Plaintiffs failed to offer any such proof, and therefore no damages or attorney fee awards may be imposed against any of the individual homeowners.
As the Court of Appeals correctly held, at common law members of unincorporated associations have been held jointly and severally liable for all debts of the association. Nolan v. McNamee, 82 Wash. 585, 144 P. 904 (1914). At the same time, there is considerable authority that the member of a nonbusiness nonprofit unincorporated association is liable on contracts of the association only insofar as the member assented to or ratified the contract, and is liable for torts only if the member participated in or ratified the action resulting in liability. See generally 6 Am. Jur.2d Associations and Clubs §§ 43-48 (1963); see also David J. Oliveiri, Annot., Liability of Member of Unincorporated Association for Tortious Acts of Association's Nonmember Agent or Employee, 62 A.L.R.3d 1165 (1975); see, e.g., Victory Comm. v. Genesis Convention Ctr., 597 N.E.2d 361 (Ind.App.1992); Lyons v. American Legion Post No. 650 Realty Co., 172 Ohio St. 331, 175 N.E.2d 733 (1961); Leslie v. Bendl, 92 Or.App. 519, 759 P.2d 301, review denied, 307 Or. 245, 767 P.2d 75 (1988); Hutchins v. Grace Tabernacle United Pentecostal Church, 804 S.W.2d 598 (Tex.Ct. App.1991).[6]
As one commentator explains, the strict application of respondeat superior to find member liability comes from the rules of law developed in the field of business relationships. Howard L. Oleck, Nonprofit Corporations, Organizations, and Associations, 114 (4th ed. 1980). When such law is transferred to other forms of voluntary associations, where individual members may have little or no authority in the day-to-day operations of the association, "reality is apt to be sacrificed to theoretical formalism." Id. Courts, therefore, have in some cases recognized that individual members of some associations may not be "in any true sense principals" of the individuals through whom the association acts. Id. These courts have held that individual members are not liable unless they authorize or ratify the acts of the association's agents. Id. at 115. Thus, resort to agency principles is helpful in determining the liability of the individual members of a nonprofit, nonbusiness, unincorporated association. See 6 Am.Jur.2d Associations and Clubs § 46, at 478-79 (1963); Lyons, 172 Ohio St. 331, 175 N.E.2d 733.
Community associations vary in their nature. Their primary role is "that of a service-oriented, cooperative business." Wayne S. Hyatt, Condominium and Homeowner Association Practice: Community Association Law § 3.01, at 41 (2d ed. 1988). In particular, a community association may have a "broad business-like purpose revolving around maintenance and upkeep of the common property" with associated fiscal responsibilities. Id. at 42. However, business responsibilities vary from association to association, dependent in part on the documentation creating the association which contains both requirements and grants of power. Id. at 42-43.
Although the homeowners association here has some business-like features such as membership fees and budgeting for maintenance of planting easements and entrance gates, the main purposes of the association as defined by the documentation are design review and enforcement of the restrictive covenants. The association is nonprofit and unincorporated.
*683 Here, considering the nature of the association and the limited authority of the members, we conclude that joint and several liability will be limited to those members who violated the covenants by participating in or ratifying the unreasonable, arbitrary decision to reject Plaintiffs' proposed residence under the consent to construction covenant. We draw by analogy from those cases involving liability to third parties where a nonbusiness, nonprofit unincorporated association is involved. Although a community association may have some business-like characteristics, the nature of this homeowners association is far removed from that of associations organized for trade or profit.
The liability question here involves both the actions of the Board and the issue of ratification of that decision by the homeowners. Under agency law, "[r]atification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." National Bank of Commerce v. Thomsen, 80 Wash.2d 406, 413, 495 P.2d 332 (1972) (citing Restatement (Second) of Agency § 82 (1958)). To be charged by ratification with the unauthorized act of an agent, the principal must act with full knowledge of the facts, accept the benefits of the acts, or without inquiry assume an obligation imposed. Stroud v. Beck, 49 Wash.App. 279, 286, 742 P.2d 735 (1987).
Strictly speaking, the issue here is ratification of the Board's wrongful decision, because the covenants grant authority to accept or reject a lot owner's plans for construction or remodeling. Nonetheless, the issue is one of ratification, and therefore these agency principles provide a helpful framework for determining whether ratification has occurred.
Plaintiffs have not identified which particular homeowners ratified the Board's decision, and there are no findings of fact on the matter. However, the trial court's entry of judgment jointly and severally against all the individual defendant homeowners plainly shows that court's view that joint and several liability extended to all defendant homeowners, and accordingly Plaintiffs were not put to any such burden of proof.
Because we hold that only those who participated in or ratified the Board's decision are to be jointly and severally liable, it follows that remand for further fact-finding is necessary on this issue. See, e.g., Wagner v. Foote, 128 Wash.2d 408, 908 P.2d 884 (1996) (matter remanded where necessary findings in support of damages award not made). We note that the record does indicate that the Board members unanimously rejected Plaintiffs' plans when it made its decision, Ex. 16, and thus supports joint and several liability insofar as the Board members are concerned.
Upon remand, the burden of proof is on Plaintiffs. See generally, e.g., Johnson v. First Nat'l Bank, 253 Ga. 233, 319 S.E.2d 440 (1984); Morvant v. Arnoult, 490 So.2d 549 (La.Ct.App.1986); Hutcheson & Co. v. Providence-Washington Ins. Co., 341 S.W.2d 142 (Mo.Ct.App.1960); A.B.F. Freight Sys., Inc. v. Austrian Import Serv., Inc., 798 S.W.2d 606 (Tex.Ct.App.1990); Colorado Nat'l Bank v. Miles, 711 P.2d 390 (Wyo.1985).
Following fact-finding, the appellant homeowners (petitioners) who participated in or ratified the decision to reject Plaintiffs' proposal shall be jointly and severally liable, along with those defendant homeowners who did not appeal and those who moved for dismissal from the appeal and therefore are not entitled to the benefit of this decision.[7]
Finally, as the Court of Appeals noted, the homeowners assigned error to a number of findings of fact regarding which they have raised no issue. The Court of Appeals correctly declined to consider the assignments of error. Substantial evidence supports *684 those findings significant to this decision which have been the subject of argument.

Conclusion
We hold that a homeowners association may not impose restrictions under a general consent to construction covenant which are more burdensome than provided for by specific objective restrictive covenants. Under the covenants at issue here, the homeowners had authority to consider size, height and proximity when considering approval of Plaintiffs' building plans under the general consent to construction covenant. However, the association's decision was unreasonable and arbitrary and in violation of the covenants because it was made without adequate investigation and was based upon inaccurate information. We affirm the trial court's determination that Plaintiffs may build their proposed home provided that a natural exterior finish reasonably approved by the association is used.
Defendant homeowners who did not appeal, those who were dismissed from the appeal, and those who did appeal and who participated in or ratified the Board's decision shall be jointly and severally liable. We remand for a factual determination as to which of the petitioners-homeowners participated in or ratified the Board's decision.
DOLLIVER, SMITH, JOHNSON and ALEXANDER, JJ., concur.
SANDERS, Justice (concurring in part, dissenting in part).
I concur with the majority except insofar as it remands for determination of which individual association members shall be jointly and severally liable. I would affirm the Court of Appeals on this issue as well, based upon the majority's insightful pronouncement that "[a]s the Court of Appeals correctly held, at common law members of unincorporated associations have been held jointly and severally liable for all debts of the association. Nolan v. McNamee, 82 Wash. 585, 144 P. 904 (1914)." Majority at 681. While the majority does not overrule Nolan, it refuses to follow it, relying instead upon authority from other jurisdictions. The holding of the majority on this point is therefore contrary to law because it declines to follow Nolan, which, under the rule of stare decisis, is binding until overruled. Hamilton v. Department of Labor & Indus., 111 Wash.2d 569, 571, 761 P.2d 618 (1988). Moreover, the Nolan rule makes good sense. This association can take action only collectively. A single member can neither require the association to act nor restrain it therefrom. The members of the association act in concert in all matters, and the individual acts of component association members are simply irrelevant for the purpose of establishing association liability, which, as a matter of law, is also the liability of every constituent member. Accord, Burks v. Weast, 67 Cal.App. 745, 228 P. 541, 543 (1924) ("[W]here parties are associated and conduct business as an unincorporated association, they are regarded as partners, so far as affects the question of liability for the debts ... incurred by the association.").
In place of the clear rule and the reasons which support it, the majority promotes chaos by inviting a factual inquiry into the individual actions, or inactions, of every association member. By consensually entering into the association, however, each association member is bound, by his own previous consent, to all legal rights and liabilities which may flow to him by virtue of association action. If individual members of the association feel aggrieved by the unfair imposition of liability, their remedy is against their fellow association members and/or controlling members, although it is not a defense to the lawful claims of third persons injured by concerted association activity. Burks, 228 P. at 543. Therefore, I dissent to this portion of the majority opinion and would simply affirm the Court of Appeals.
DURHAM, C.J., and GUY, J., concur.
NOTES
[1] Plaintiffs point out the letter says "SURPRISE! No meeting required." Exhibit 40. In context, this does not appear to mean that any required procedure was lacking or any attempt to circumvent required procedures was attempted. There is no dispute in this case that all necessary procedures were followed and that Plaintiffs were able to present their views at the December 9, 1992, and January 18, 1993, meetings. Instead, the Board president appears to have been saying that if all the lot owners voted by proxy, no meeting would be required. See Exhibit 40.
[2] Appellants included Bruce and Bev Attebery, John and Cathy Coart, Ed and Arline DeGroot, Jerry and Helen Greenan, Kathy Hodge, Ronald J. Manko Levite, Fred and Elizabeth Maxam, V.O. and Lucy McDole, Bruce Ries, Marilyn Donogh-Ries, and Robert and Marian Webb.
[3] The trial court also reasoned that the fact that the homeowners rejected an amendment granting discretion to restrict height below the maximum in the present covenants shows that the design review authority did not include height. We disagree, as the record indicates that some homeowners voted against the amendment because they thought the Board already had that discretion and thought the amendment was not necessary.
[4] Another concern expressed at trial was that the lot was special because it was so visible to those entering the subdivision and accordingly a large home would undesirable on the lot. Even this may be debated, since the lot drops off and the present structure is built below the street elevation.
[5] The court in Schwarzmann v. Association of Apartment Owners, 33 Wash.App. 397, 402 n. 1, 655 P.2d 1177 (1982), said that the business judgment rule was codified at former RCW 23A.08.343. That statute included an ordinary care standard. The homeowners association act, enacted in 1995, Laws of 1995, ch. 283, and not applicable here, states that an association's officers and members of the board shall exercise the same degree of care and loyalty as an officer or director of a nonprofit corporation under RCW 24.03. RCW 64.38.025. RCW 24.03.127 defines a director's duties comparably to those set out in former RCW 23A.08.343, including a standard of ordinary care. (The standards for directors and offices of corporations are presently set out in RCW 23B.08, and include an ordinary care standard.)
[6] The Texas court has held that liability of an individual condominium association member for damages where injury resulted from conditions of the commonly held areas is pro rata rather than joint and several. E.g., Dutcher v. Owens, 647 S.W.2d 948, 39 A.L.R.4th 92 (Tex.1983). Washington has a statute providing for similar limited liability for condominium association members under such circumstances. RCW 64.32.240. Cases like Dutcher are not particularly helpful where the issue involves use of a lot owner's land in the face of restrictive covenants, rather than commonly held areas. The homeowners association act is silent on this liability issue, RCW 64.38, and in any case was enacted after the trial in this case. Laws of 1995, ch. 283.
[7] We note the possibility on remand that if any of the appealing homeowners are determined not to be liable, the issue may arise as to whether those homeowners are also prevailing parties for purposes of attorney fees and costs. We are unaware of any additional agreements between Plaintiffs and any homeowners which may affect responsibility for the judgment. We make no comment about the effect of any such agreements.